# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

DWIGHT WILSON, JESUS A. AVELAR-LEMUS,
JESSIE CROSS, and MATTIE CROSS
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.

                                        **CLASS ACTION**
                                        **JURY DEMAND**

EVERBANK, N.A., EVERHOME MORTGAGE,
ASSURANT, INC., STANDARD GUARANTY
INSURANCE COMPANY, and AMERICAN
SECURITY INSURANCE COMPANY,

        Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiffs DWIGHT WILSON, JESUS A. AVELAR-LEMUS, JESSIE CROSS, and

MATTIE CROSS file this class action complaint on behalf of themselves and all others similarly

situated against EVERBANK, N.A. ("Everbank"), EVERHOME MORTGAGE (together with

EverBank, the "Everhome Defendants"), ASSURANT, INC. ("Assurant"), STANDARD

GUARANTY INSURANCE COMPANY ("Standard Guaranty" or "SGIC"), and AMERICAN

SECURITY INSURANCE COMPANY ("American Security" or "ASIC," together with

Assurant and SGIC the "Assurant Defendants").

## INTRODUCTION

### The Force-Placed Insurance Industry

1.     Lenders and servicers force place insurance when a borrower fails to obtain or

maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.

Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

2.      However, mortgage lenders and servicers, like the Everhome Defendants here, have set up questionable and often illegal practices related to force-placed insurance.  The lenders and servicers have entered into exclusive and collusive relationships with certain force-placed insurance providers, here Assurant and its affiliates SGIC and ASIC, that result in exceptional profits to both the lenders and the force-placed insurers

3.      The arrangements comprise an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants. There are just two insurance companies that control nearly the entire market for forced-placed policies in the country—Assurant and QBE.  Assurant works through its subsidiaries, including American Security and Standard  Guaranty. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks," in the form of direct payments (sometimes disguised as "expense reimbursements") or in the form of a percentage of the force-placed policy premiums – ultimately charged to the borrower, offer them subsidized or discounted administrative services, and enter into lucrative captive reinsurance deals with them.

4.      The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for the force-placed insurance premiums by lenders or servicers – the Everhome Defendants here.  In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no

claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5.      The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6.      Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market, which leads to artificially inflated premiums that are charged to consumers, resulting in premiums up to **ten times** greater than those available to the consumer in the open market.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7.      At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

8.      Assurant, a named defendant here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks disguised as commissions and other benefits.

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                          18                                    August 9, 2012

9.      It is no surprise that these Defendants' practices have come under increased

scrutiny in recent years by the government and regulators.  For example:[2]

- On March 21, 2013, the New York Department of Financial Services'
  ("NYDFS"), investigation into force-placed insurance practices "produced
  a major settlement with the country's largest 'force-placed' insurer,
  Assurant, Inc. . . . [The settlement] includes restitution for homeowners
  who were harmed, a $14 million penalty paid to the State of New York,
  and industry-leading reforms that will save homeowners, taxpayers, and
  investors millions of dollars going forward through lower rates."[3]  Further,
  under the Consent Order entered, Assurant and its subsidiaries (including
  ASIC), are prohibited from paying commissions to any servicers or entity
  affiliated with a servicer on force-placed insurance policies obtained by
  the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

---

[2] The Defendants' practices have also come under increased scrutiny by the courts.  This Court
has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance,
Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on the same practices
described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D.
Fla. 2012).

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading
Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of
Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at*,
http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

354696                                         5

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

- On October 17, 2013, The Florida Office of Insurance Regulation and ASIC entered into a Consent Order that prohibits ASIC from, among other things, paying a commission to a servicer or lender, using an affiliate of a lender to reinsure the FPI policies, or providing free or below-cost outsourced services to mortgage servicers or their lenders.

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[5]

10.     Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

---

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*, http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

[5] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

**LPI Premium by State:  Florida Has Become Ground Zero**

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                    August 9, 2012

11.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by the Everhome Defendants, Assurant, SGIC, and ASIC.

**PARTIES**

**Plaintiffs**

12.     Plaintiff DWIGHT WILSON is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

13.     Plaintiffs JESSIE AND MATTIE CROSS are citizens of the State of Illinois. They are natural persons over the age of 21 and otherwise *sui juris*.

14.     Plaintiff JESUS A. AVELAR-LEMUS is a citizen of the State of New York.  He is a natural person over the age of 21 and otherwise *sui juris*.

**Defendants**

15.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth in lender placed homeowner's insurance . . . .  The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender placed program." [6]

16.     Upon information and belief, Assurant owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including SGIC and ASIC) to operate their force-placed insurance business under that name.

17.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  American Security often operates under the trade name "Assurant Specialty Property."  American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

18.     Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Georgia.  Standard Guaranty also often operates under the trade name "Assurant Specialty Property."  Standard Guaranty

---

[6] *See* Assurant Form 10-K for the fiscal year ending December 31, 2011, at 5, *available at* http://www.sec.gov/Archives/edgar/data/1267238/000119312512075371/d257568d10k.htm.

along with American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed

19.     Upon information and belief, American Security and Standard Guaranty pass much of their profits from force-placed insurance to their corporate parent, Assurant.

20.     Defendant EVERBANK, is a diversified financial services company headquartered in Jacksonville, Florida and, among other things, provides banking and home loan mortgages.  EverBank regularly conducts business in the State of Florida and throughout the United States.

21.     Defendant EVERHOME MORTGAGE is believed to be an affiliate of EverBank and is also headquartered in Jacksonville, Florida.  Upon information and belief, Everhome Mortgage provides mortgage servicing for Everbank and is registered to do business in the State of Florida and regularly conducts business there and throughout the United States.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

23.     Plaintiffs are citizens of the States of Florida, Illinois, and New York. Defendants are citizens of Florida and various other states but are registered to do business in the aforementioned states.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

24.     This Court has jurisdiction over Defendants because they are either Florida

corporations or foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

25.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants. 28 U.S.C. § 1332(d)(2). Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6).

26.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District. Venue is also proper here because at all times relevant hereto, Plaintiff Wilson resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

27.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

28.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements. The standard form mortgage agreements used by the

Everhome Defendants include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

29. What is unknown to borrowers and not disclosed in the mortgage agreements is that the Everhome Defendants have exclusive arrangements with Assurant and its affiliates, including ASIC and SGIC, to manipulate the force-placed insurance market and artificially inflate the amounts they charge to borrowers for force-placed insurance "premiums." The charges are inflated to provide the Everhome Defendants and their affiliates with kickbacks often disguised as "commissions" or "expense reimbursements," or to cover the cost of discounted services, or to provide the lender or servicer with lucrative reinsurance arrangements as well as to include unmerited charges. The borrower is then forced to pay the inflated charges.

### The Force-Placed Insurance Scheme

30. The Assurant Defendants have exclusive arrangements with Everbank and Everhome Mortgage to monitor their mortgage portfolios and provide force-placed insurance. In addition to subsidized mortgage services received from the Assurant Defendants, a percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to the Everhome Defendants or their affiliates – which in turn compensate Everbank or Everhome Mortgage in the form of "soft-dollar" credits, direct payments, or "expense reimbursements." Upon information and belief, the Everhome Defendants receive additional compensation from the Assurant Defendants through captive reinsurance arrangements, direct payments, or expense reimbursements.

354696

11

31.     The scheme works as follows.   The Everhome Defendants purchase master insurance policies that cover the entire portfolio of mortgage loans.   In exchange, the Assurant Defendants are given the exclusive right to force their own insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.   Assurant and its affiliates monitor the Everhome Defendants' entire loan portfolio for lapses in borrowers' insurance coverage.   Once a lapse is identified, an Assurant affiliate, (in Plaintiffs' case, ASIC or SGIC), send notice to the borrower, on letterhead purporting to come from the lender or servicer, that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.   If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

32.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower.   In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the borrower is charged for the "cost" of the past premiums.

33.     Once coverage is forced on the property, the Everhome Defendants pay the insurer and charge the borrower for the payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[7]   The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

34.     The Everhome Defendants pay the premiums to the insurers who then kick back a

---

[7] On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

set percentage to the Everhome Defendants or their affiliates as a "commission." Upon information and belief, a percentage of the payment made to an Everhome Defendant affiliate is then shared with the lender or servicer, sometimes in the form of "soft dollar" credits, "expense reimbursements," or in some other form.

35.     Upon information and belief, the Everhome Defendants also enter into an arrangement with the Assurant Defendants that provide the Everhome Defendants or their affiliates with "qualified expense reimbursement" payments. These "expense reimbursements" were not legitimate reimbursements for actual costs and were simply another form of a kickback to the Everhome Defendants for the exclusive arrangement to force-place insurance. The Everhome Defendants did not perform any bona fide services nor incur any costs for the payments that they received.

36.     The money paid back to the Everhome Defendants and their affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving. In an attempt to mask the kickbacks as legitimate, Assurant, ASIC, or SGIC will often disclose to the borrower that affiliates of the Everhome Defendants may earn "commissions" as a result of the forced placement of new coverage or that the Everhome Defendants incurred "costs" as a result of the force-placement of insurance. In reality, however, no work is ever done by the Everhome Defendants or their affiliates to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place. As a result, no commission or compensation is "earned" and the Everhome Defendants do not incur any costs in relation to the force-placement of insurance for any particular borrower.

37.     Under this highly profitable force-placed insurance scheme, the Everhome Defendants are incentivized to purchase and force place insurance policies with artificially inflated premiums on borrowers' properties because the higher the cost of the insurance policy, the higher the kickback. And, as a result of the kickbacks, the Everhome Defendants effectively

pay a reduced amount for the force-placed insurance policy but choose not to pass these savings on to the borrowers.

38.     The Assurant and Everhome Defendants also enter into agreements for ASIC or SGIC to provide servicing activities on their entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio. These charges, passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities.

39.     Thus, the small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring the Everhome Defendants' entire loan portfolio, effectively resulting in an additional kickback.

40.      In addition, upon information and belief, the Assurant Defendants will enter into essentially riskless "captive reinsurance arrangements" with the Everhome Defendants or their affiliates to "reinsure" the property insurance force-placed on borrowers.  A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

41.    The Everhome Defendants' reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to the Everhome Defendants at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, the Everhome Defendants or their affiliates enter into reinsurance agreements with the Assurant Defendants that provide that the insurer will return to the Everhome Defendants significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to their affiliates or subsidiaries.  The ceded premiums are nothing more than a kickback to the Everhome Defendants and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while the Everhome Defendants or their affiliates purportedly provided reinsurance, they did not assume any real risk.

42.    The Everhome Defendants also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard

form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

43.      The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when the Everhome Defendants add the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

44.      The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

45.      Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies intended to be sold to lenders or servicers and their terms are determined by the lender or servicer – the Everhome Defendants, and the insurer - the Assurant Defendants

46.      Plaintiffs here, do not challenge the Everhome Defendants' right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary

coverage, which the Everhome Defendants purchase from the Assurant Defendants and then choose to pass on to the borrower. Servicers, like the Everhome Defendants, are financially motivated to utilize the insurer, like the Assurant Defendants, that offers it the best financial benefit in the terms of "commissions," direct payments, discounted tracking services, or ceded reinsurance premiums This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

### Plaintiff Dwight Wilson

47.     Plaintiff Dwight Wilson took a mortgage loan from Coral Gables Federal Savings and Loan Association in September, 1994 secured by a mortgage on real property in North Palm Beach, Florida.  In 2001, Plaintiff Wilson's mortgage was refinanced with Community Savings, F.A.  Plaintiff Wilson's mortgage was subsequently acquired by the Everhome Defendants. Upon information and belief, Everhome Mortgage was responsible for the servicing of Mr. Wilson's mortgage.  At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned or serviced by the Everhome Defendants.

48.     Mr. Wilson's mortgage agreement is attached as **Exhibit A**.

49.     Mr. Wilson had voluntary insurance coverage through Fidelity Fire & Casualty. On April 25, 2013, Fidelity Fire & Casualty chose not to renew Mr. Wilson's coverage.

50.     Mr. Wilson subsequently obtained voluntary through Federated National Insurance Company with an effective date of May 15, 2013.

51.     Despite Mr. Wilson securing this coverage, the Everhome Defendants, purchased an annual force-placed hazard insurance policy from Assurant's subsidiary American Security Insurance Company and force-placed it on Mr. Wilson's home.

354696                                          17

52.     The annual cost of the force-placed policy was approximately $13,000 and provided less coverage than Mr. Wilson's prior policy.

53.     The Everhome Defendants created an escrow account for Mr. Wilson with a debit for the approximate $13,000 in force-placed insurance charges.

54.     Mr. Wilson's voluntary insurance through Federated National Insurance Company lapsed again in December of 2013.

55.     In January 2014, Mr. Wilson again secured voluntary insurance for his property.

56.     The Everhome Defendants subsequently refunded portions of the approximate $13,000 first charged to Mr. Wilson but they ended up charging Mr. Wilson over $700 for a less than two-month period.

57.     Mr. Wilson has continued to make his mortgage payments and portions of those payments have gone to paying on the force-placed insurance.

58.     The Defendants never disclosed to Mr. Wilson that the "cost" of the insurance that they were force-placing on him included unearned kickbacks to the Everhome Defendants as well as the cost of servicing the Everhome Defendants mortgage portfolio.  The amounts kicked back to the Everhome Defendants were not reduced from the amount charged to Plaintiff Wilson.

59.     There are no material differences between these Defendants' actions and practices directed to Mr. Wilson and their actions and practices directed to the Class.

**Plaintiff Jesus A. Avelar-Lemus**

60.     Plaintiff Jesus A. Avelar-Lemus took a mortgage loan from Opteum Financial Services, LLC,  on June 24, 2005, secured by a mortgage on real property in Westbury, New York.   At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned and/or serviced by the Everhome Defendants.

61.   Mr. Avelar-Lemus's mortgage agreement is attached as **Exhibit B**.

62.   Until sometime in 2010, Mr. Avelar-Lemus had paid an annual premium of between approximately $1,845 and $2,345.08 for homeowner's insurance coverage obtained in the open market.

63.   By letter dated July 16, 2010, the Everhome Defendants notified Mr. Avelar-Lemus of a lapse in his homeowner's coverage and that it already had acquired an insurance policy from American Security for retroactive coverage on Mr. Avelar-Lemu's property which had commenced on June 24, 2010.   This premium for this policy was $5,248.00, which the Everhome Defendants charged to Mr. Avelar-Lemus's escrow account and informed Mr. Avelar-Lemus that "[t]he premium as been charged to your escrow account and your payment will be adjusted appropriately."   Included in this charge was nearly one month's worth of retroactive coverage for a time period during which no claims had been made and no damage had been sustained to the property.  The Defendants never disclosed to Mr. Avelar-Lemus that the "cost" of the insurance that they force-placed on him included unearned kickbacks to the Everhome Defendants as well as the cost of servicing the Everhome Defendants mortgage portfolio.  The amounts kicked back to the Everhome Defendants were not reduced from the amount charged to Plaintiff Avelar-Lemus.  The letter dated July 16, 2010, also disclosed that "Everinsurance an affiliate of Everhome Mortgage Company, may receive a commission on the premium charged."

64.   By letter dated June 17, 2011, the Everhome Defendants notified Mr. Avelar-Lemus that it was renewing the force placed policy with American Security for another year, effective June 24, 2011, and that the annual premium was $5,248.00. This letter also indicated that Everinsurance, an affiliate of the Everhome Defendants may receive "commission" on the premium charged.

65.     Upon information and belief, this same policy was renewed by the Everhome Defendants in 2012.

66.     By letter dated July 3, 2013, the Everhome Defendants notified Mr. Avelar-Lemus that they had renewed the lender placed hazard insurance policy with American Security on his property for another year, and that the policy effective date was retroactive to June 24, 2013.  The annual premium on this policy renewal was $4,563.00.

67.     There are no material differences between these Defendants' actions and practices directed to Mr. Avelar-Lemus and their actions and practices directed to the Class.

**<u>Plaintiffs Jessie and Mattie Cross</u>**

68.     The Cross Plaintiffs obtained a mortgage loan from CMSC Mortgage Company secured by a mortgage on real property in East St. Louis, Illinois.  At all times relevant to the allegations herein, Plaintiffs' mortgage loan was owned and/or serviced by the Everhome Defendants.

69.     The Cross Plaintiffs' mortgage agreement is attached as **Exhibit C**.

70.     In October 2012, the Cross Plaintiffs' voluntary insurer, Allstate, declined to renew the Cross Plaintiffs insurance.

71.     Thereafter, the Everhome Defendants through their exclusive relationship with Assurant and its affiliate Standard Guaranty, force-placed an insurance policy from Standard Guaranty.

72.     The following year, the Everhome Defendants renewed the force-placed insurance and charged the amount to the Cross Plaintiffs.

73.     The annual amount charged to the Cross Plaintiffs for the force-placed policy was approximately $1,600 and included amounts for the kickbacks provided to the Everhome

Defendants.

74.     The Defendants never disclosed to the Cross Plaintiffs that the "cost" of the insurance that they were force-placing on them included unearned kickbacks to the Everhome Defendants as well as the cost of servicing the Everhome Defendants mortgage portfolio.  The amounts kicked back to the Everhome Defendants were not reduced from the amount charged to Plaintiff Wilson

75.     There are no material differences between these Defendants' actions and practices directed to the Cross Plaintiffs and their actions and practices directed to the Class

## CLASS ALLEGATIONS

### A.     Class Definitions

76.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

Nationwide class:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property through the Everhome Defendants or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

Florida Subclass as to Count V – Florida Deceptive and Unfair Practices Act:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State of Florida, through the Everhome Defendants or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

New York Subclass as to Count XI – New York Deceptive Practices Statute, General Business Law Section 349:

>   All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State of New York, through the Everhome Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

77.     Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

78.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.      Numerosity**

79.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the states of Florida and Illinois, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.      Commonality**

80.     There are questions of law and fact that are common to Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the

following:

a.   Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages or backdated coverage that covered periods of time for which Defendants had no risk of loss;

b.   Whether the Everhome Defendants breached the mortgage contracts with Plaintiffs and the Class by charging them amounts for force-placed insurance that included illegal kickbacks (including unwarranted commissions, "expense reimbursements," and reinsurance payments) and by charging Plaintiffs and the Class for servicing their loans;

c.   Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

d.   Whether the Everhome Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated amounts for insurance premiums being charged to Plaintiffs and the Class;

e.   Whether Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

f.   Whether the Everhome Defendants or their affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.   Whether the charges to Plaintiffs and the Class are inflated to include kickbacks and unwarranted "commissions;"

h.   Whether the charges to Plaintiffs and the Class are inflated to include amounts for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i.   Whether the charges are inflated to include the cost of a captive reinsurance arrangement;

j.   Whether the Everhome Defendants violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.   Whether the Everhome Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.   Whether an objective consumer would be deceived by Everhome Mortgage's arrangement, which incentivizes Defendants to charge inflated and unnecessary fees for force-placed insurance, and therefore violates FDUTPA;

m.   Whether Defendants actions and failure to disclose the real reasons for the high priced force placed policy premiums were likely to deceive the consuming public in violation of the NYDPA;

n.   Whether the Assurant Defendants intentionally and unjustifiably interfered with the Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio;

o.   Whether Defendants were associated with the enterprise and agreed and conspired to violate the Federal RICO statutes; and

p.   Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.   <u>Typicality</u>**

81.   Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.   <u>Adequacy of Representation</u>**

82.   Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

83.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.    Requirements of Fed. R. Civ. P. 23(b)(3)**

84.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

85.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

86.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

87.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.**     **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

88.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

89.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
## (against the Everhome Defendants)

90.     Plaintiffs re-allege and incorporate paragraphs 1-89, above as if fully set forth herein and further allege as follows.

91.     Plaintiffs and all similarly situated class members have mortgages that are owned or serviced by the Everhome Defendants.

92.     Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by the Everhome Defendants.

93.     Plaintiffs' mortgages require that they maintain insurance on their property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

354696

94.    The Everhome Defendants charge borrowers premiums that include unearned kickbacks, reinsurance premiums, "expense reimbursements," as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting the Everhome Defendants' rights or risk in the collateral for borrowers' mortgage loans.  The Everhome Defendants breached the mortgage agreements by, among other things, charging Plaintiffs and class members the amounts beyond the actual cost of coverage.

95.    The Everhome Defendants have also breached Plaintiffs' and the Class members' mortgage agreements by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the Everhome Defendants' rights in their collateral or cover their risk.

96.    Plaintiffs and the Class members have suffered damages as a result of the Everhome Defendants' breaches of contract.

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the Everhome Defendants' breach of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against the Everhome Defendants)

97.    Plaintiffs re-allege and incorporate paragraphs 1-89, above as if fully set forth herein and further allege as follows.

98.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for

substantial compliance with the spirit, not just the letter, of a contract in its performance.

99.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

100.    Plaintiffs' and the Class Members' mortgage contracts allow the Everhome Defendants to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

101.    The Everhome Defendants are afforded substantial discretion in force-placing insurance coverage.  They are permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate any price for the coverage they procure.  The servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.  Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

102.    The Everhome Defendants breached the implied covenant of good faith and fair dealing by, among other things:

> (a)  Manipulating the force-placed insurance market by selecting insurers (here, Assurant and its affiliates) that will artificially inflate premiums to include kickbacks to the Everhome Defendants and issue excess insurance coverage not necessary to cover the Everhome Defendants' risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

> (b)  Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

> (c)  Assessing inflated and unnecessary amounts for insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(d)    Allowing the Everhome Defendants or their affiliates to collect a percentage of the premiums charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)  Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(f)  Charging Plaintiffs and the Class for "expense reimbursements" when no expenses are incurred by the Everhome Defendants in the force-placement of a borrower's insurance;

(g)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(h)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(i)  Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(j)  Charging Plaintiffs and the Class an inflated amount for the force-placed insurance premium due to the captive reinsurance arrangement.

103.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.   Plaintiffs also seek compensatory damages resulting from the Everhome Defendants' breaches of the implied covenant.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

## UNJUST ENRICHMENT
### (against the Everhome Defendants)[8]

104.    Plaintiffs re-allege and incorporate paragraphs 1-89 above as if fully set forth herein and further allege as follows.

105.    The Everhome Defendants and their affiliates received from Plaintiff and Class members, benefits in the form of inflated amounts for insurance premiums related to force-placed insurance policies, unwarranted kickbacks, reimbursements, captive reinsurance arrangements, and subsidized loan servicing costs.

106.    These Defendants entered into an agreement whereby the insurance vendor— here, Assurant's subsidiaries, including American Security and Standard Guaranty, would provide force-placed insurance policies to the Everhome Defendants for the portfolio of loans monitored on behalf of the Everhome Defendants.  The Everhome Defendants would then charge Plaintiffs and the Class amounts that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

107.    These Defendants also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

108.    The Assurant Defendants paid and collected significant monies in premiums, kickbacks, "expense reimbursements," and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Unearned commissions or kickbacks were paid

---

[8] Plaintiffs plead their unjust enrichment claim against the Everhome Defendants in the alternative to their contractual claims against them.

directly to the Everhome Defendants or their affiliates in order to be able to exclusively provide force-placed insurance policies.  The Assurant Defendants were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the Everhome Defendants and/or their affiliates.

109.    These payments directly benefitted the Everhome Defendants or their affiliates and were taken to the detriment of the borrower.  The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

110.    Further, the Everhome Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, or "soft-dollar" credits.

111.    As a result, Plaintiffs and the Class have conferred a benefit on the Everhome Defendants.

112.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

113.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Everhome Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT
### (against Assurant, Standard Guaranty, and American Security)

114.    Plaintiffs re-allege and incorporate paragraphs 1-89 above as if fully set forth herein and further allege as follows.

115.    The Assurant Defendants received from Plaintiffs and the Class members, benefits in the form of funds for insurance premiums related to force-placed insurance policies.

116.    The Assurant Defendants received below-cost payments from the Everhome Defendants for providing tracking services but included the entire cost of that tracking service in the premiums for force-placed insurance that were ultimately charged by the Everhome Defendants to the borrowers.  The Assurant Defendants knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them but did not reduce the charges by the amounts paid to them from the Everhome Defendants for the tracking services

117.    The Assurant Defendants paid significant monies to the Everhome Defendants in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Everhome Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

118.    The Everhome Defendants also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

119.    The Everhome Defendants were mere conduits for the delivery of funds for insurance premiums to the Assurant Defendants.

120.   As a result, Plaintiffs and the Class have conferred a benefit on the Assurant Defendants.

121.   These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

122.   These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

## VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (Plaintiff Wilson against Everhome Mortgage)

123.   Plaintiff Wilson re-alleges and incorporates paragraphs 1-89 above as if fully set forth herein and further alleges as follows.

124.   FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

125.   Plaintiff and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

126.   Everhome Mortgage has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

127.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated charges related to premiums for force-placed insurance by the above-named Plaintiff and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for Everhome Mortgage.

128.    Specifically, Everhome Mortgage had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the Florida Subclass, and then receive compensation through kickbacks in the form of "commissions," "expense reimbursements," below=cost services, or captive reinsurance arrangements.

129.    Everhome Mortgage's conduct of charging an inflated amount for its force-placed insurance to Plaintiff and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

130.    Everhome Mortgage is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, it is not a bank or savings and loan association regulated by federal agencies.

131.    Plaintiff and the Florida Subclass have sustained damages as a direct and proximate result of Everhome Mortgage's unfair and unconscionable practices.    Section 501.211(2), Florida Statutes, provides Plaintiff and the Florida Subclass a private right of action against Everhome Mortgage and entitles them to recover their actual damages, plus attorneys' fees and costs.

132.    Plaintiff and the Florida Subclass have suffered and will continue to suffer irreparable harm if Everhome Mortgage continues to engage in such deceptive, unfair, and

unreasonable practices.

**WHEREFORE,** Plaintiff Wilson, on behalf of himself and the Florida Subclass, demands judgment against Everhome Mortgage for damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

<u>COUNT VI</u>

<u>VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.*</u>
<u>(against the Everhome Defendants)</u>

133.    Plaintiffs re-allege and incorporate paragraphs 1-89, above as if fully set forth herein and further allege as follows.

134.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

135.    The Everhome Defendants are "creditors" as defined by TILA because they owned or serviced Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the Everhome Defendants were the creditors.

136.    Pursuant to TILA, the Everhome Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties.  *See* 12 C.F.R. § 226.17(c).

137.    The Everhome Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when they: (i) added charges for force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, or other profiteering involving the Everhome Defendants or their affiliates as a result of the purchase of force-placed insurance.

138.    When the Everhome Defendants changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of the Everhome Defendants' interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, the Everhome Defendants were then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.   On information and belief, the Everhome Defendants increased the principal amount under Plaintiffs' mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

139.    The Everhome Defendants adversely changed the terms of Plaintiffs' loan after origination in order to allow themselves or their affiliate to receive a kickback on force-placed insurance premiums.   These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  The Everhome Defendants have never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

140.    The Everhome Defendants also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

141.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because the Everhome Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the Everhome Defendants and their affiliates and was concealed from borrowers.

142.    Plaintiffs and Class Members have been injured and have suffered a monetary

loss arising from the Everhome Defendants' violations of TILA.

143.    As a result of the Everhome Defendants' TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

144.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the Everhome Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against the Everhome Defendants awarding actual damages and a penalty of $500,000.00 or 1% of the Everhome Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by the Everhome Defendants, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VII

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against Assurant, Standard Guaranty and American Security)

145.    Plaintiffs re-allege and incorporate paragraphs 1-89, above as if fully set forth herein and further allege as follows.

146.    Plaintiffs and the Class members have advantageous business and contractual relationships with the Everhome Defendants pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

147.    Assurant and its subsidiaries, including ASIC and SGIC, have knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and the Everhome Defendants.  The Assurant Defendants are not parties to the mortgage contracts, nor are they third-party beneficiaries of the mortgage contracts.

Further, the Assurant Defendants do not have any beneficial or economic interest in the mortgage contracts.

148.    The Assurant Defendants intentionally, unjustifiably, and in bad faith interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with the Everhome Defendants and their affiliates, whereby they provide compensation (unearned kickbacks, expense reimbursements, reinsurance, and low cost services) to the Everhome Defendants in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

149.    Plaintiffs and the Class have been damaged as a result of the Assurant's, SGIC's, and ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members similarly situated, seek a judgment in their favor against the Assurant Defendants for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT VIII

## BREACH OF FIDUCIARY DUTY
### (against the Everhome Defendants)

150.    Plaintiffs re-allege and incorporate paragraphs 1-89, above as if fully set forth herein and further allege as follows.

151.    The Everhome Defendants hold funds in escrow on behalf of borrowers whose mortgages they service.  These funds are designated for the purpose of paying insurance

premiums as they come due, and any excess funds are to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

152.    The Everhome Defendants are in a fiduciary relationship with Plaintiffs and the Class because the Everhome Defendants receive a greater economic benefit from these transactions than they would from a typical escrow transaction.  Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when the Everhome Defendants took it upon themselves to manage borrowers' escrow accounts and then withdrew money from borrowers' escrow accounts to pay force-placed insurance premiums.  The Everhome Defendants violated their fiduciary duties when they arranged to receive unlawful and unearned kickbacks or other compensation under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgages.

153.    The Everhome Defendants breached their fiduciary duties to Plaintiffs and other members of the proposed class by: (1) not acting in borrowers' best interest when they profited from force-placed insurance policies that were purchased using escrow funds they held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members; and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

154.    These actions were undertaken by the Everhome Defendants in bad faith for their own benefit and were not intended to benefit these Plaintiffs or other proposed Class members.

155.    As a direct result of the Everhome Defendants' actions and subversion of Plaintiffs' interest to their own in reaping extravagant and outrageous fees, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs and the proposed class are entitled to damages for the Everhome Defendants' breaches of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because the Everhome Defendants acted in bad faith in deliberate or reckless disregard of both their rights and the Everhome Defendants' obligation to hold their escrow funds in trust.

## COUNT IX

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (against all Defendants)

156.    Plaintiffs re-allege and incorporate paragraphs 1-89 of this complaint as if fully set forth herein.

157.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

158.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included the Everhome Defendants, Assurant, SGIC, and ASIC.

159.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class Members to pay unreasonably high amounts for force-placed insurance through a scheme that inflated such charges to cover kickbacks and expenses associated with monitoring the Everhome Defendants' entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the amounts charged to borrowers for force-placed insurance premiums generated by the joint scheme.

160.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

161.    The Everhome Defendants, Assurant, SGIC, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

162.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.

163.    For example, Assurant, SGIC, and ASIC, with the approval of the Everhome Defendants, sent form letters to Plaintiffs on Everhome Mortgage letterhead, stating that Everhome Mortgage would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.  These Defendants represented in the letters that the Everhome Defendants would purchase the required coverage and charge the borrower the "cost" of the insurance.  In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the true "cost" of the policies, when in fact such charges also included unearned kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost servicing, and other compensation returned to the Everhome Defendants or their affiliates. Defendants had a duty to correct this mistaken impression. The omission was material, as it gave

Defendants a colorable reason to charge Plaintiffs unreasonably high amounts for premiums and would have influenced Plaintiffs' decision whether to pay the amounts or contest them.  One such letter was sent to Plaintiff Wilson on August 9, 2013; Plaintiff Avelar-Lemus on July 3, 2013; and the Cross Plaintiffs on November 27, 2013.

164.    Assurant, SGIC, and ASIC, with the approval of the Everhome Defendants and on Everhome Mortgage letterhead also sent Plaintiffs and the Class members force-placed insurance notices informing them that force-placed insurance had been purchased.  The letters represented that the Everhome Defendants would "pay the <u>cost</u> of this insurance from your escrow account." (emphasis added).   One such letter including this misrepresentation was sent to Plaintiff Wilson on January 10, 2013.

165.    The Assurant Defendants, with the approval of the Everhome Defendants, also sent form letters to Plaintiffs on Everhome Mortgage letterhead, stating that the Everhome Defendants would purchase force-placed coverage if voluntary insurance was not secured by a certain date.  These Defendants represented in the letters that the costs of the insurance would likely be much higher than the cost of coverage you could obtain on your own "because the insurance we purchase is issued automatically without evaluating the risk of insuring your property."   In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the true "cost" of the policies and the sole reason for the extraordinarily high "cost" was the absence of an individualized evaluation of risks.  In fact, the amounts charged to Plaintiffs were extraordinarily high because they also included kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned to the Everhome Defendants or their affiliates.  Defendants had a duty to

correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably high premiums and would have influenced Plaintiffs' decisions whether to pay the premiums or contest them.  One such letter was sent to Plaintiff Wilson on August 9, 2013 and Plaintiff Avelar-Lemus on July 3, 2013.

166.    The Assurant Defendants, with the approval of the Everhome Defendants also sent Plaintiff Avelar-Amus a form letter on June 17, 2011 indicating that an affiliate of the Everhome Defendants – Everinsurance "may receive a commission on the premium charged." The form letter misleads Plaintiffs and borrowers into believing that the payment made to Everinsurance in connection with Defendants' force-placed insurance program was a true "commission" for work it performed related to Plaintiffs' force-placed insurance.  This is a misrepresentation because Everinsurance was not compensated for any work performed.  The letter, that is, omitted to disclose that the payment was in fact a kickback to Everinsurance and the Everhome Defendants.

167.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to kickbacks in various forms, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

168.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high charges for force-placed insurance premiums.

WHEREFORE, Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT X

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) (against all Defendants)

169.    Plaintiffs re-allege and incorporate paragraphs 1-89 and 157-168 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

170.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

171.    Defendants agreed that SGIC, ASIC, and Assurant would be the Everhome Defendants' exclusive force-placed insurance providers and that unreasonably high amounts for force-placed insurance premiums would be extracted from the Everhome Defendants' customers. Defendants also agreed that the Assurant Defendants would pay unearned kickbacks in the form of "commissions," direct payments, "expense reimbursements," and below-cost services to the Everhome Defendants or their affiliates.

172.    The Everhome Defendants' affiliates pass much of their profits from this scheme back to the Everhome Defendants.

173.    ASIC and SGIC pass much of their profits from this scheme to Assurant.

174.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

175.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class

members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT XI

### VIOLATION OF THE NEW YORK DECEPTIVE PRACTICE ACT GENERAL BUSINESS LAW § 349
### (On Behalf of Plaintiff Avelar-Lemus and the New York Subclass)

176.    Plaintiff re-alleges and incorporates paragraphs 1-89 of this complaint as if fully set forth herein.

177.    The New York Deceptive Practices Act, General Business Law §349 ("NYDPA") provides that "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state are hereby declared unlawful."

178.    Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their business, trade and/or commerce and in the furnishing of loan servicing in the State of New York. The Everhome Defendants had an exclusive relationship with their vendor and preferred insurance carrier, whereby they would pay unreasonable and inflated premiums for force placed insurance policies, charge that amount to Plaintiff and the New York Subclass, and then receive compensation through either a kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

179.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiff and the New York Subclass. The Assurant Defendants, with the approval of the Everhome Defendants, sent form letters to Plaintiff on Everhome Mortgage letterhead, stating that Everhome Mortgage would purchase or renew

354696                                          45

force-placed coverage if voluntary insurance was not secured by a certain date. Defendants represented in the letters that the costs of the insurance would likely be much higher than the cost of coverage the borrower could obtain on their own "because the insurance we purchase is issued automatically without evaluating the risk of insuring the structure of your home."

180.   In making this statement, Defendants deceived and misrepresented to Plaintiff and the New York Subclass that the force-placed insurance premiums Defendants charged Plaintiff represented the "cost" of the policies and the sole reason for the extraordinarily high "costs" was the absence of an individualized evaluation of risks. In fact, such premiums were extraordinarily high because they also included kickbacks, reinsurance profits, and other wrongful benefits that the Everhome Defendants received from the Assurant Defendants.

181.   The Everhome Defendants also represented to Plaintiff Avelar-Lemus and other members of the New York Subclass that its affiliate, Everinsurance, may receive a "commission" on the premium charged. In making this representation, the Everhome Defendants falsely implied that Everinsurance would perform services for which it earned a commission, but upon information and belief, no actual work was performed by Everinsurance or the Everhome Defendants in exchange for a commission. Thus, the Everhome Defendants and their affiliate, Everinsurance, instead received a kickback, rather than an earned commission, on the premium charged to Plaintiff and the other members of the New York Subclass.

182.   Plaintiff Avelar-Lemus and the New York Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the Everhome Defendants' deceptive and unconscionable practices directed at the consuming public.

183.   The Everhome Defendants' deceptive acts and practices were consumer oriented

and were willful or showed reckless disregard for whether such acts violated the NYDPA.

184.   Plaintiff Avelar-Lemus and the New York Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.  Plaintiff and the New York Subclass are entitled to actual damages, statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other remedies available under the NYDPA or in equity, for the Everhome Defendant's violations of the NYDPA. See N.Y. Gen. Bus. Law § 349(h).

**WHEREFORE,** Plaintiff Jesus A. Avelar-Lemus, on behalf of himself and the New York Subclass, demands judgment against Defendants for compensatory damages, pre- and post-judgment interest, treble damages, attorney's fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)   Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class and the Florida and New York Subclasses;

(2)   Enjoining Defendants from continuing the acts and practices described above;

(3)   Awarding damages sustained by Plaintiffs and the Class as a result of the Everhome Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)   Finding that Defendants have been unjustly enriched and requiring Defendants to

refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiff Wilson and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)     Awarding Plaintiff Avelar-Lemus and the New York Subclass actual and treble damages, injunctive relief, declaratory relief, pre- and post-judgment interest, attorneys' fees and costs under the NYDPA;

(8)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant Defendants' interference;

(9)     Awarding actual damages and a penalty of $500,000.00 or 1% of the Everhome Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(10)    Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(11)    Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 18th day of June, 2014.

By: /s/ Robert J. Neary

| | |
|---|---|
| Adam M. Moskowitz, Esq. | Aaron S. Podhurst, Esq. |
| amm@kttlaw.com | apodhurst@podhurst.com |
| Thomas A. Tucker Ronzetti, Esq. | Peter Prieto, Esq. |
| tr@kttlaw.com | pprieto@podhurst.com |
| Rachel Sullivan, Esq. | John Gravante, III, Esq. |
| rs@kttlaw.com | jgravante@podhurst.com |
| Robert J. Neary, Esq. | Matthew Weinshall |
| rn@kttlaw.com | mweinshall@podhurst.com |
| **KOZYAK, TROPIN, &** | **PODHURST ORSECK, P.A.** |
| **THROCKMORTON P.A.** | City National Bank Building |
| 2525 Ponce de Leon Blvd., 9th Floor | 25 West Flagler Street, Suite 800 |
| Coral Gables, FL 33134 | Miami, Florida 33130 |
| Telephone:  (305) 372-1800 | Telephone: 305-358-2800 |
| Facsimile:    (305) 372-3508 | Facsimile: 305-358-2382 |
| *Counsel for Plaintiffs* | *Counsel for Plaintiffs* |
| Lance A. Harke, Esq. | Jack Scarola |
| lharke@harkeclasby.com | JSX@SearcyLaw.com |
| Sarah Engel, Esq. | **SEARCY DENNEY SCAROLA** |
| sengel@harkeclasby.com | **BARNHART & SHIPLEY** |
| Howard M. Bushman, Esq. | 2139 Palm Beach Lakes Boulevard |
| hbushman@harkeclasby.com | West Palm Beach, FL 33409 |
| **HARKE CLASBY & BUSHMAN LLP** | Telephone: (561) 686-6300 |
| 9699 NE Second Avenue | Facsimile: (561) 383-9451 (fax) |
| Miami Shores, Florida 33138 | *Counsel for Plaintiffs* |
| Telephone:     (305) 536-8220 | |
| Facsimile:      (305) 536-8229 | |
| *Counsel for Plaintiffs* | |
| William F. Merlin, Jr., Esq. | Eric D. Holland, Esq. |
| wmerlin@merlinlawgroup.com | EHolland@allfela.com |
| FL Bar No. 364721 | Gerry Schneller, Esq. |
| Mary E. Fortson, Esq. | GSchneller@allfela.com |
| mfortson@merlinlawgroup.com | **HOLLAND GROVES SCHNELLER &** |
| FL Bar No. 114596 | **STOLZE** |
| Sean Shaw, Esq. | 300 N Tucker Blvd |
| sshaw@merlinlawgroup.com | St Louis, MO 63101 |
| FL Bar No. 0690988 | Tel: 314-241-8111 |
| Phillip Sanov, Esq. | Fax: 314-241-5554 |
| psanov@merlinlawgroup.com | *Counsel for Plaintiffs* |
| *Pro Hac Vice* Pending | |
| **MERLIN LAW GROUP, P.A**. | |
| 777 South Harbour Island Blvd., Suite 950 | |
| Tampa, FL 33602 | |

| | |
|---|---|
| Telephone: (813) 229-1000<br>Fax: (813) 229-3692<br>*Counsel for Plaintiffs* | |
| Roosevelt N. Nesmith, Esq.<br>roosevelt@nesmithlaw.com<br>**LAW OFFICE OF**<br>**ROOSEVELT N. NESMITH, LLC**<br>300 Broadacres Drive, Suite 410<br>Bloomfield, NJ 07043<br>Telephone: (973) 259-6990<br>Facsimile: (866) 848-1368<br>Counsel for Plaintiffs | Catherine E. Anderson, Esq.<br>canderson@gslawny.com<br>Oren S. Giskan, Esq.<br>ogiskan@gslawny.com<br>**GISKAN SOLOTAROFF**<br>**ANDERSON & STEWART, LLP**<br>11 Broadway, Suite 2150<br>New York, NY 10004<br>Telephone: (212) 847-8315<br>Facsimile: (646) 520-3236<br>*Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 18th day of June, 2014 and served by the same means on all counsel of record.

By:  /s/ Robert J. Neary