# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:14-cv-22264-BLOOM/VALLE

DWIGHT WILSON, JESUS A. AVELAR-
LEMUS, JESSIE CROSS, and MATTIE
CROSS, on behalf of themselves and all
others similarly situated,

       Plaintiffs,

v.

EVERBANK, N.A., STANDARD
GUARANTY INSURANCE COMPANY,
AMERICAN SECURITY INSURANCE
COMPANY, and VOYAGER INDEMNITY
INSURANCE COMPANY,

       Defendants.

_____/

## CLASS COUNSEL'S RESPONSE TO BOTH OBJECTIONS
## TO THE PROPOSED CLASS ACTION SETTLEMENT

## INTRODUCTION

Class Counsel are proud to announce that the parties' Settlement has received near-universal support from the class.  Out of 45,504 class members that received notice of this settlement, just *two* objections (.004%) were submitted.  One of the two objections was brought by an attorney in the Virgin Islands and relies *solely* upon false information that could have easily been checked and corrected.  The objecting attorney contends that ASIC cannot issue lender-placed insurance in the Virgin Islands, but Defendants have verified that ASIC is an admitted carrier in the Virgin Islands, was authorized to issue lender-placed coverage there, filed its rates there, and had them approved by Virgin Islands Division of Banking and Insurance.  The Court should overrule this objection, if it is not first withdrawn.

The sole remaining objection was filed by serial objectors, Amarali and Janet Jabrani, who filed similar objections in lender-placed insurance class actions against SunTrust and Wells Fargo and have objected in five class action lawsuits.  Ms. Jabrani testified at her recent deposition that when she and her husband receive a class action notice in the mail, it is their practice to immediately call their attorney, Christopher Bandas, who then objects to the settlement.[1]  Mr. and Mrs. Jabrani also conceded at their depositions that they had never read their own objection, did not help draft the objection, and would be paid up to $5,000 by Mr. Bandas for lending their names to the objection and holding up the settlements.  Class Counsel request that the Court not only overrule the Jabrani objection, but also require either the Jabranis or one of their attorneys to appear at the Final Fairness Hearing and explain their reasons for continuing to pursue their objection so

---

[1] Class Counsel deposed Mr. and Mrs. Jabrani just two days ago, on January 5, 2016.  Class Counsel has received the rough drafts of the transcripts, but is prohibited by contract from filing them with the Court.  Class Counsel will file the final deposition transcripts, which should be available this week, as soon as they receive them.

as to delay relief to more than 45,000 class members.[2, 3]

Christopher Bandas makes a business of challenging consumer class action lawsuits, has been taken to task by numerous federal judges, [4] and stands to profit from his objection here. "[C]ourts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *Lee v. Ocwen*

---

[3] Class Counsel will file a separate Motion respectfully requesting that the Court require either Mr. or Mrs. Jabrani, or one of their three retained counsel, to appear at the Final Fairness Hearing in light of these serious issues and explain any basis for their objection. There is a severe disconnect between the Jabranis' offered basis for the objection and papers filed by Mr. Bandas. The Jabranis testified they had never read the objection, had no involvement in the Objection, and have never spoken to Class Counsel or anyone at Assurant or Everbank about this case or even their lender-placed insurance.

[4][4] Mr. Bandas was recently sanctioned by a federal court in Washington and forbidden from practicing in that district, *see Dennings v. Clearwire Corp.*, No. 2:10-cv-1859-JLR (W.D. Wash.) [D.E. 166] ("The court rules that the appropriate sanction is to revoke Mr. Bandas' authorization to practice in the Western District of Washington."), and other courts have commented on his conduct as well. *See, e.g., Allen v. J.P. Morgan Chase Bank, N.A.*, No. 15-3425 (7th Cir. 2015) (ordering Bandas to post appeal bond in the amount of $5,000, with a possible increase of the bond to $121,886 pending briefing on the merits of the appeal); *In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (finding a client of Bandas to have brought appeal in bad faith in part due to Bandas' involvement as a "known vexatious appellant"); *In re CertainTeed Fiber Cement Siding Litigation*, MDL No. 2270, Dkt. No. 129, at 1 (E.D. Pa. 2014) (finding "[Mr. Bandas' assertions in his objections are] entirely devoid of merit."), Dkt. No. 137 (granting appeal bond against Bandas in the amount of $5,000); *In re Hydroxycut Marketing & Sales Practices Litig.*, No. 09-md-2087, 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) (finding that Mr. Bandas demanded $400,000 in return for making his objection "go away."); *In re Cathode Ray Tube Antitrust Litig.*, 281 F.R.D. 531, 533 & n.4 (N.D. Cal. 2012) (noting that Bandas has come under scrutiny, and citing particularly *Brown v Wal-Mart Stores, Inc.*, where the court stated that "Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'... [Bandas's and his clients] attempt to inject themselves at the last minute into this eight year litigation constitutes an effort to extort money from the Class and/or Class Counsel.") (citing Dkt. No. 1062-1, p. 11 of 26 (Order entered in Brown v Wal-Mart Stores, Inc.). *See also Dennings* [D.E. 166-1] (noting that Mr. Bandas' objections were overruled and, his application for admission pro hac vice denied due to his "attempt[s] to 'hijack' the settlement of this case from deserving class members and dedicated, hardworking counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees'.").

*Loan Servicing, LLC*, No. 14-cv-60649, 2015 WL 5449813, at *14 (S.D. Fla. Sept. 14, 2015) (quoting *Dennis v. Kellogg Co.*, No. 09-cv-1786-L, 2013 U.S. Dist. LEXIS 163118, at *11, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013)).This Court should consider Mr. Bandas' objection through the lens of his history of misconduct and frivolous objections.

Mr. Bandas knows well that his objections to the claims-made structure of the Settlement and Class Counsel's proposed fees have been overruled in at least seven other force-placed insurance class action settlements in this district alone. Mr. Bandas also represented a lead objector before the Eleventh Circuit in *Poertner v. Gillette Co.*, 618 Fed. App'x 624 (11th Cir. 2015), where, as here, he challenged the claims-made structure of the settlement and the calculation of class counsel's fees based on the monetary and injunctive relief *made available* to the class rather than the value of the claims actually made by class members. Mr. Bandas seeks to distinguish *Poertner* because the Eleventh Circuit decisively rejected his objections there, and rightfully so.

The Eleventh Circuit in *Poertner* was clear: "the use of a claims process is not inherently suspect[,]" 618 Fed. App'x at 628 (citation omitted), and a settlement can be fair, reasonable, and adequate even if a claims-made structure is not necessary. Every court to have considered a force-placed insurance settlement employing a claims-process like the one presented here has agreed. And the type of direct-pay settlement for which Mr. Bandas advocates has been characterized as problematic by several courts, and by one as "not extraordinary, particularly when compared to the settlements achieved in [claims-made force-placed insurance class action settlements]." *Arnett v. Bank of America, N.A.*, No. 3:11-cv-1372 (D. Or.)[ECF No. 305 at 4].

The Eleventh Circuit was equally clear in holding that Class Counsel's fees should be calculated as a percentage of the total relief made available to the class, rather than a percentage of the value of the claims actually paid. This rule makes sense: when class members are given a

fair and informed opportunity to participate in a class action settlement, their counsel's compensation should depend on the opportunity created and the risk undertaken in doing so, not on how many class members decide to take advantage of that opportunity. The fees that Class Counsel seeks here fall well below the 25%-30% benchmark set by the Eleventh Circuit, amounting to 19.8% of the monetary relief made available to the class alone.

Court should overrule both objections to the Settlement.

## ARGUMENT

### I. THE CLAIMS-MADE STRUCTURE OF THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

Mr. Bandas challenges the Settlement's claims-made structure, arguing that "the particulars of the claims process" render the settlement unfair, inadequate, and unreasonable and, as a result, that Class Counsel is inadequate under Rule 23(a) to represent the class and should not be awarded $2.5 million in attorneys' fees and costs. [ECF No. 158.] He suggests that Class Counsel should instead have agreed to direct-pay settlement, by which Defendants would either credit 12.5% of a borrower's net written premium to his or her active EverBank escrow account or mail the borrower a check in the same amount. [*Id.* at 8-11.] This argument is flawed first and foremost because it assumes that Defendants would have agreed to such a settlement. *See Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014) ("'While a direct payment structure would obviously result in more, and possibly all, class members receiving a share of the monetary relief in the settlement, there is no reason to believe the defendants would agree to such terms' and, in any event, the Court 'does not have the authority to impose a preferred payment structure upon the settling parties.'") (quoting *Casey v. Citibank, N.A.*, No. 13-cv-820, 2014 WL 4120599, at *2-3 (N.D.N.Y. Aug. 21, 2014)).

They would not—the claims-made structure of this Settlement arose from compromise and

will provide the best practicable relied to class members who choose to submit a claim.

> Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.

*Hanlon v. Chrysler Corp.*, 150 F.3d at 1011, 1027 (9th Cir. 1998); *see also, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("Neither should it be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.") (internal quotation marks omitted).

Even were this not the case, Mr. Bandas' contention that a direct-pay structure would serve the class better than a claims-made structure is entirely beside the point—the Court is not charged with choosing the *best* payment structure or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the claims-made settlement presented is fair, reasonable, and adequate given the inherent risks and expense of further litigation. *See, e.g., Lee v. Ocwen Loan Servicing, LLC*, No. 13-cv-60649, 2015 WL 5449813, at *16 (S.D. Fla. Sept. 14, 2015) ("*Gillette* also rejects the notion that the Court must identify the payment structure that would provide *optimal* relief to the class, or that a claims-made process may be employed only if the parties show that it is necessary. The Court's job instead is to determine whether the settlement as presented is fair, reasonable, and adequate."); *Casey*, 2014 WL 4120599 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties"). Thus, although direct-pay settlements have been approved as reasonable by district courts in smaller lender-placed insurance class actions, claims-made

settlements can *also* be fair, reasonable, and adequate, and have been found to be so in every instance on final approval. *See, e.g., Lee*, 2015 WL 5449813, at *21 (S.D. Fla. Sept. 14, 2015) ("In this Court's judgment, a claims-made settlement here offers Settlement Class members the best relief possible from this Settlement. Defendants state that they did not and would not have agreed to a direct-pay model for a class of this size because the costs of administration and the risk of fraud would have been prohibitive. Even had Defendants agreed, the additional costs and increased risk would have reduced the amounts paid to individual class members."); *Braynen v. Nationstar Mortg. LLC*, No. 14-cv-20726, 2015 WL 6872519, at *14 (S.D. Fla. Nov. 9, 2015) ("While a claims-made settlement structure does not guarantee an award to all class members, it does tend to maximize the opportunity available to each class member."); *Hall v. Bank of Am., N.A.*, No. 12-cv-22700 (S.D. Fla.) [ECF No. 443 at 9-10] ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (quoting *Saccoccio*); *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (same); *Hamilton v. SunTrust Mortg., LLC*, No. 13-cv-60749 (S.D. Fla.) [ECF No. 178 at 11] ("Filing a claim form is a "reasonable administrative requirement" which generally does not impose an undue burden on members of a settlement class.") (citation omitted); *Casey*, 2014 WL 4120599 (granting final approval). *See also, e.g.,* Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2012), *available at* http://www.dfs.ny.gov/about/press2013/assur-order-130321.pdf (providing claims-made structure for New York homeowners with LPI).

Indeed, the Eleventh Circuit has affirmed claims-made settlements in other contexts affording far less relief to class members than that afforded here. *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with

enhanced consumer protections); *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 432, 434-35 (11th Cir. 2012) (upholding claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value).

Direct-pay settlements also present significant issues. A direct-pay structure, for example, presents a risk of fraud, with checks—here in amounts up to thousands of dollars—being sent to outdated addresses or cashed by individuals other than the mortgagor at the same address. A claims process, on the other hand, may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010). Judge Goodman addressed this issue recently in *Braynen*, where he granted final approval to the proposed class action settlement. Judge Goodman noted that a direct-pay structure carried problems of its own, including the lack of any guarantee that all class members would secure relief and the high cost and burden of administering such a settlement. *See Braynen*, 2015 WL 6872519, at *14. Judge Goodman also reasoned that the *Braynen* Settlement's claims process would ensure that only aggrieved individuals received monetary relief and to "reduce the risk of fraud, waste, and abuse that might arise from sending unsolicited checks to unverified addresses and recipients." *Id.* (citing *Hall*, 2014 WL 7184039, at *6). He continued:

> Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. Non-class members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important where a case presents a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially make settlement more costly than litigation." *Hamilton*, 2014 WL 5419507, at *6. In addition, under a hypothetical direct-payment structure without the Claim Form, the risk of waste increases. From an administrative standpoint, disbursement activity in a direct-payment structured class settlement, including printing and mailing of checks, can be quite expensive.

Checks in larger amounts (*e.g.*, over $100) are likely to be printed on higher-quality paper using security features. Returned checks can be expensive to process. And the accounting and bank fees associated with large volumes of returned and remailed checks also would be significant. Unsolicited mail is more likely to be discarded or set aside. Printing and mailing checks to hundreds of thousands of Settlement Class Members who never asked for them could significantly increase the cost and effort of administering the Settlement. The Claim Form's verifications are thus the best chance at ensuring that the right persons receive the right payments at the right addresses.

*Id.* at *15.

Compounding these deficiencies, direct-pay settlements often provide less substantial relief to class members who would have opted to file a claim. For example, in *Arnett v. Bank of America, N.A.*, No. 3:11-cv-1372 (D. Or.), Bank of America borrowers with force-placed flood insurance brought claims against the lender to recover damages for both unearned "commissions" that had inflated the amounts paid for FPI, and flood coverage that had been placed in excess of that required by their mortgage agreements and federal regulations. *See Arnett*, 2014 U.S. Dist. LEXIS 130903, at *18-20 (D. Or. Sept. 18, 2014). The parties settled claims based on both theories, with a direct-pay structure designed to distribute settlement proceeds to class members with "commission"-based claims, and a claims-made structure for borrowers with claims based on excess coverage.[5] *See id.* at *19-20. Under the direct-pay program, Bank of America established a common fund from which attorney's fees, service awards, and certain administration costs were

---

[5] The excess coverage claim concerned the practice of informing the borrower that they needed to purchase additional insurance in order to comply with their insurance obligations. Borrowers who purchased the additional insurance were allowed to make claims for a portion of the fund. It would have been possible for the defendant to search its records for evidence of this individual insurance, however, like this action, that process would have been too time consuming and expensive. Accordingly, the parties agreed to a claims-made structure in *Arnett* for that portion of the settlement.

deducted first. *See Arnett*, Settlement Agreement [ECF No. 237-1] ¶¶ 2(u), 2(w), 27, 28.[6]  The remaining "Net Settlement Fund" was distributed to the class based on their pro rata settlement shares of the total net written premium. *See id.* ¶ 29.  The end result was that class members received 2.28% of the premium paid, with the average gross payout equaling $69.14.  *See Arnett*, Declaration of Arthur Olson [ECF No. 270]**.**

The direct-pay program in *Arnett* provided each settlement class member with *far less significant relief* than that made available to class members here.  Even the court in *Arnett* recognized this in denying class counsel's request for attorney's fees in excess of the Ninth Circuit's 25% benchmark because "the results obtained [in *Arnett*] were not extraordinary, particularly when compared to the settlements achieved in *Fladell* … and *Casey*[,]" *Arnett*, [ECF No. 305 at 4], where the parties had negotiated claims-made settlements that would provide participating class members with relief comparable to that offered here.  *See Arnett*, 2014 U.S. Dist. LEXIS 130903, at *35-37 (explaining that upward departure from benchmark fee not warranted because results were not extraordinary, and describing settlement structures in *Fladell* and *Casey* that paid participants "longer injunctive relief and better monetary relief" of between 7% and 12.5% percent of their actual premiums with no pro rata reduction).

Here, as in *Fladell*, *Casey*, *Braynen, Lee*, and other approved settlements, the settlement will compensate class members who opt to make a claim for a significant part of the allegedly inflated portion of the amount that they either paid or were charged for lender-placed insurance.  All class members who paid any portion of a force-placed premium and who submit a valid claim form will recover an amount equal to 12.5% of the net premium charged.  [ECF No. 154-1 ¶¶

---

[6]     The *Arnett* settlement documents are also available at http://www.floodinsurancesettlementbana.com/hc/en-us.

4.6.2, 4.6.3]. This amount will be calculated from the entire premium, rather than the alleged "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property. The majority of the settlement class will have a strong incentive to submit a claim form—the 12.5% recovery made available to individual borrowers may yield settlement payments of hundreds or thousands of dollars if a claim is filed. As this Court reasoned in approving the *Saccoccio* settlement, this relief "very likely exceeds what Plaintiffs could have won at trial." 297 F.R.D. at 693. "Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those who would take the minimal step of returning the simple Claim Form to receive the larger amount." *Braynen*, 2015 WL 6872519, at *14.

Mr. Bandas attempts to distinguish the Eleventh Circuit's recent opinion in *Poertner v. Gillette Co.*, 618 Fed. App'x 624 (11th Cir. 2015), but the distinctions he cites are immaterial, and *Poertner*, in fact, *supports* final approval of this Settlement. In *Poertner*, a class of consumers filed suit against Gillette and its parent, Procter & Gamble, alleging that their Duracell Ultra Power batteries did not last longer than Duracell "Copper Top" batteries as advertised, and that the companies had wrongfully charged a price premium based on their false representations. *See Poertner*, 618 Fed. App'x at 625-26; Third Amended Complaint, *Poertner v. Gillette Co.*, No. 6:12-cv-00803 (M.D. Fla. Nov. 1, 2013) [ECF No. 117]. The parties ultimately reached a settlement covering a nationwide class of 7.26 million consumers, who would recover $3.00 per pack of batteries purchase if they filed a valid claim form. *See Poertner*, 618 Fed. App'x at 625-26. The defendants also agreed to remove the allegedly misleading representations about the batteries from their packaging, and agreed to donate $6 million worth of batteries to charitable organizations as a *cy pres* award. *See id.* The settlement also allowed class counsel to seek up to

$5.68 million in fees and costs without opposition from the defendants; as here, this amount was negotiated after all other material terms, and would not be deducted from a fixed common fund. *See id.*

Objectors challenged the "claims-made" structure and class counsel's fees and costs, among other things, asking specifically whether the "settlement [wa]s the best practical means of providing relief to the class." *See id.* at 629. The district court overruled all objections, and the Eleventh Circuit affirmed. *See id.* at 631.

On the question of the settlement's claims-made structure, the court noted first that "the use of a claims process is not inherently suspect." *Id.* at 628 (citation omitted). The Court also made note that the that the claims process—which involved a one-page form asking the class member for contact information, the number of packages of batteries purchased, the type and size of the batteries, the purchase location, and the devices in which the batteries were used—was not "particularly difficult or burdensome[,]" *id.* at 626, 628, and rejected the objectors' proposal that class counsel's fee award, which had been calculated based on the total relief made available to the class and charitable interests, should be based only on the total amount paid out to class members who submitted claims. *See id.* at 630.

The Court also rejected the objectors' contention that the approved settlement was not "the best practical means of providing relief to the class" because it would be possible to provide direct payment to at least some portion of the class. *See id.* at 629-30. The Court was clear: "[E]ven if it was possible to identify *some* unnamed class members, that does not mean that the district court lacked the discretion to approve the settlement as fair absent the identification of these class members." *Id.* at 630 (emphasis in original).

The same holds true here. Even if Defendants could identify class members to whom direct

payments could be made, the court would not then lack discretion to find that the settlement reached is fair, reasonable and adequate.  And district court judges have exercised their discretion in no fewer than seven force-placed insurance class actions to hold exactly so, granting final approval to settlements structured precisely like the one presented to this Court.  *See, e.g.*, *Lee*, 2015 WL 5449813, at *21 (S.D. Fla. Sept. 14, 2015) ("In this Court's judgment, a claims-made settlement here offers Settlement Class members the best relief possible from this Settlement."); *Braynen*, 2015 WL 6872519, at *14 ("a claims-made settlement structure … tend[s] to maximize the opportunity available to each class member"); *Hall*, No. 12-cv-22700 (S.D. Fla.) [ECF No. 443 at 9-10] ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (quoting *Saccoccio*); *Saccoccio*, 297 F.R.D. at 696 (S.D. Fla. 2014) (same); *Fladell*, 2014 WL 5488167, at *4 (same); *Hamilton*, No. 13-cv-60749 [ECF No. 178 at 11] ("Filing a claim form is a "reasonable administrative requirement" which generally does not impose an undue burden on members of a settlement class.") (citation omitted); *Casey*, 2014 WL 4120599 (granting final approval of claims-made force-placed insurance settlement); *Williams v. Wells Fargo Bank, N.A.*, No 11-cv-21233 (S.D. Fla.) [ECF No. 356].

The claim form here, too, is neither particularly difficult nor burdensome—class members are asked to complete a simple claim form by providing their contact information; checking a box to indicate whether they still owe or have paid in full their force-placed insurance charges; and if all charges have been paid in full, providing a copy of a mortgage statement, a photocopy of a valid form of identification, the signature of any adult witness, *or* a completed notary verification. [ECF No. 149-1.]  These safeguards are hardly burdensome, particularly given that Defendants will be sending class members checks worth hundreds or thousands of dollars.

Mr. Bandas also expresses concern that the claims-made process was designed to limit the

number of claims submitted [ECF No. 158 at 5-6], but, as explained above, the claims process is uncomplicated and, of equal importance, there is no evidence of collusion among the parties, because there was none.   Moreover, courts in this circuit routinely approve claims-made settlements with response rates below 10%, recognizing that class members' legitimate reasons for not submitting claim forms do not necessarily reflect on the fairness or strength of a negotiated settlement.   *See, e.g., Bennett v. Behring Corp.*, 737 F.2d 982, 986 & n.9 (5.6% recovery fair and adequate in view of risks of further litigation); *LiPuma v. Am. Express Co.,* 406 F. Supp. 2d 1298 (S.D. Fla. 2005) (settlement recovering 8.1% of possible damages fair, adequate, and reasonable).

Mr. Bandas' arguments against a claims-made structure also fail to account for the injunctive relief secured for the class and the significant costs and hurdles the class would have faced had they proceeded with litigation.   Plaintiffs would have been required to brief class certification and summary judgment, but LPI class actions have met mixed results on class certification motions and Defendants would have raised dispositive defenses, including the applicability of the filed-rate doctrine, on summary judgment.   *Compare Kunzelmann*, 2013 U.S. Dist. LEXIS 3962 (S.D. Fla. Jan. 10, 2013) (declining to certify class in LPI hazard litigation) *with Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506, 2014 U.S. Dist. LEXIS 81646 (N.D. Cal. June 13, 2014) (certifying multiple statewide classes); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665 (S.D. Fla. 2012) (certifying Florida class on implied covenant, unjust enrichment, and tortious interference claims).   *See also, e.g., Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2014 U.S. Dist. LEXIS 119464 (S.D. Fla. Aug. 25, 2014) (noting possible changing trend in LPI litigation and potentially viable summary judgment defenses).   Accounting for these risks highlights the reasonableness of the proposed settlement.   *See, e.g., In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 529 (E.D. Mich. 2003) (overruling objections that "fail[ed] to consider the additional

litigation risks, expenses and delay avoided by" the proposed settlement).

As for Mr. Bandas' contention that the class period, which runs from January 1, 2009 to August 31, 2015, is unnecessarily short, five years and eight months exceeds the limitations period for the vast majority of the class's claims. Had this case proceeded through litigation, class members whose insurance coverage was forced more than four or five years ago would possibly have lost their claims or had them severely narrowed. This settlement, that is, offers class members *more* relief than that to which they were entitled by law.

The Court should overrule any objections relating to the claims process because it is reasonable and will provide maximum relief to the class. *See, e.g., McKinnie v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 811-12 (E.D. Wis. 2009) (claims-made settlement "eminently reasonable" because class members would be made whole).

## II.      CLASS COUNSEL IS ADEQUATE UNDER RULE 23(a).

Mr. Bandas also argues that Class Counsel is inadequate because they agreed to a claims process "that was unnecessary and designed to keep claims and the amount paid by Everbank artificially low." [ECF No. 158 at 11.] This argument is not only wholly conclusory, but also disregards the law and the evidence that the parties have presented that they negotiated the settlement at arms-length. As already established, the Court is not charged with determining whether a claims-process was *necessary* or even the best-possible option; its sole task is to determine whether the settlement negotiated by the parties is fair, reasonable, and adequate and not the product of collusion. *See* pp. 5-6, *supra*. As Judge Goodman observed in *Lee*:

> [*Poertner v.*] *Gillette* also rejects the notion that the Court must identify the payment structure that would provide *optimal* relief to the class, or that a claims-made process may be employed only if the parties show that it is necessary. The Court's job instead is to determine whether the settlement presented is fair, reasonable, and adequate.

*Lee*, 2015 WL 5449813, at *16 (citations omitted). *See also, e.g., Casey*, 2014 WL 4120599 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

Thus, Class Counsel cannot be deemed inadequate simply for agreeing to a payment structure that was not absolutely *necessary*. The Court should instead direct its focus to whether the claims-made structure negotiated here is fair, reasonable, and adequate. Numerous courts presented with force-placed insurance settlements with the same structure have held that it is. *See, e.g., Lee*, 2015 WL 5449813, at *13-14; *Braynen*, 2015 WL 6872519, at *11-14; *Saccoccio*, 297 F.R.D. at 696; *Fladell*, 2014 WL 5488167, at *4; *Hall*, No. 12-cv-22700 [ECF No. 443 at 9-10]; *Hamilton*, No. 13-cv-60749 (S.D. Fla.) [ECF No. 178 at 10-11]; *Casey*, 2014 WL 4120599, at *2-3; *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.) [ECF No. 356 at 2-3].

Moreover, there was no collusion among the parties, nor is there any reason to believe that Class Counsel would put their own interests before those of class members. To the contrary, the Assurant Defendants have offered the declaration of Rodney Max, who oversaw the mediation and "never sensed any collusiveness between the parties." Mr. Max observed that "the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." [ECF No. 156-1 ¶ 16.]

Class Counsel has also been approved as adequate under Rule 23(a) in no fewer than thirteen force-placed insurance class actions, by six different judges in this district. And, "[t]he Settlement's relief—which replicates a model approved in multiple other LPI class action settlements—independently confirms the absence of collusion." *Lee*, 2015 WL 5449813, at *12.

Class Counsel and Defendants also negotiated fees and costs *after* they had finished

negotiating the Settlement's other terms, which provides further support for a finding that there was no collusion among the parties.  *See, e.g., id.* at *12 (citing authority to holding that negotiation of fees after other terms of settlement supports finding of no collusion).

Nor is there any basis to conclude that the claims process was designed to keep the claims process low: every class member was mailed a claim form to ensure his or her participation, claim forms and instructions were mailed in English and Spanish, notice of the settlement was published twice in *USA Today*, a settlement website provided class members with copies of important settlement documents and enabled them to upload their claim forms online, a toll-free number was established for additional information, and Class Counsel set up a call center in their own offices to handle class member questions about the Settlement and claims process and help to resolve any issues with deficient claims.  The claims-made structure of this settlement is not only fair, but also offers 45,504 class members near-complete relief and prompt recovery, which could not have been achieved with a direct-pay model.

There is no basis for a finding Class Counsel inadequate to represent the Settlement Class.

### III.    CLASS COUNSEL'S FEES ARE APPROPRIATELY BASED ON THE TOTAL RELIEF MADE AVAILABLE TO CLASS MEMBERS.

The court was clear in *Poertner*:  calculating class counsel's fees as a percentage of the value of the claims actually paid to class members is *not* the appropriate method for awarding fees and expenses in the Eleventh Circuit.  *See Poertner*, 618 Fed. App'x at 630.  The court held:

> Frank claims that the settlement is unfair because class counsel's slice of the settlement pie is too large (i.e., the fees-and-costs award is unreasonable).  But this objection is based on Frank's *flawed valuation of the settlement pie*:  limiting the monetary value to the amount of Gillette's actual payments to the class along with excluding the substantial nonmonetary benefit and the cy pres award.

*Id.* (emphasis added).

Class Counsel's fees were calculated in keeping with the Eleventh Circuit's approved

methodology.  *See, e.g., id.* at 626-27, 630 (class counsel's fee award reasonable under percentage-of-fund method); *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991) ("attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class"); *Saccoccio*, 297 F.R.D. at 695 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class.") (citing *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295–96 (11th Cir.1999)); *Fladell v. Wells Fargo Bank, N.A.*, 2014 WL 5488167, at *4-5; *David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007).

Class Counsel's proposed fees-and-costs award also falls well within the range set by the Eleventh Circuit. "[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added; awarding fees of 31½% of settlement fund).  The proposed $2.5 million fee amounts to just 19.8% of the total monetary relief made available to the nationwide class, and even less when the value of the settlement's injunctive relief is taken into account.

Basing counsel's fees on the claims rate, as Mr. Bandas suggests, would be neither reasonable nor equitable.  As District Judge James Cohn stated last year in an opinion approving a claims-made settlement involving force-placed insurance:

> Where, as here, a claims-made process is a reasonable method for providing prompt and substantial relief to the class, requiring class members to file claim forms also maximizes the relief available to class members who opt to submit a claim. A settlement's fairness is judged by the *opportunity* created for the class members, *not*

*by how many submit claims.* What matters is the settlement's value to each class member—it is ultimately up to class members to participate or not.

*Hamilton*, 2014 WL 5419507, at *7 (emphasis supplied).

Correspondingly, the valuation of counsel's fees should be based on this opportunity—courts should give considerable weight to counsel's efforts to afford class members the opportunity to recover meaningful relief by availing themselves of a claims process that is procedurally fair. And counsel should not be penalized for class members' failure to take advantage of such a settlement:

> There may be many reasons or no reasons why class members decide to participate in a settlement, *e.g.,* a desire not to be involved in litigation, ideological disagreement with the justice system, their individual experiences with lender-placed insurance, or sympathy for the defendant. Further, class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form. Whatever the underlying reason, that is a decision to be made by each class member. Those decisions, however, do not affect whether the settlement provided to the Class is fair, adequate, and reasonable.

*Hall,* 2014 WL 7184039, at *8.

Courts should also take into account the significant economic risks undertaken by class counsel in litigating class actions, which are often exacerbated by the existence of competing parallel proceedings in other courts, which may reach settlement or certification first, and the considerable amount of labor that is usually undertaken to litigate a class action to resolution. Taken together, these considerations render the Eleventh Circuit's approach sound and eminently equitable.

Mr. Bandas argues further that the proposed fee award should have been based on a lodestar-crosscheck method for calculating fees, but in the Eleventh Circuit, "the lodestar approach should not be imposed through the back door via a 'cross-check.'" *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011) (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n. 41 ("The Eleventh . . . Circuit[] repudiated the use of the

18

lodestar method in common-fund cases")).   In *Camden I*, the court criticized the inefficiencies of lodestar approach, vacating the district court's order utilizing the lodestar and risk enhancement method in calculating the attorneys' fee, and directing the district court to determine a reasonable attorneys' fee based upon a percentage of a common fund.  *See* 946 F.2d at 773-75.  Other courts have also called the lodestar-crosscheck method into question because it "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Overdraft*, 830 F. Supp. 2d at 1363 (citing *David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010)).

Notably, in *Poertner*, the Eleventh Circuit did *not*, as Mr. Bandas claims, apply a 1.56 risk multiplier in performing a lodestar crosscheck of class counsel's proposed fees.  [ECF No. 158 at 12.]  The *district court* performed a crosscheck and found that "class counsel's request was reasonable under *either* the percentage of fund method … or the lodestar method," 618 Fed. App'x at 626-27 (emphasis added), but the Eleventh Circuit considered only the former, holding that counsel's fees were properly calculated as a percentage of the total "settlement pie." *Id.* at 630.

The Court should overrule Mr. Bandas' challenge to Class Counsel's fees and costs.

## IV.   THE   COURT   SHOULD   OVERRULE   OBJECTOR   MEADE'S CHALLENGE TO THE SETTLEMENT.

Objector Michelle Meade challenges the Settlement because Defendants were not "licensed to offer insurance" in the Virgin Islands, where she resides. [ECF No. 160.]  As such, Ms. Meade argues that she has suffered economic harm not only in the amount of costs that she was charged beyond the true cost of insurance, but also for damage to her credit score, "lost work/time wages, inconvenience, and time commitment involved with removing the unlawful

insurance from her condo and mitigating the impact to her credit score." [*Id.*]  The Court should overrule Ms. Meade's objection, and for several reasons.

First and foremost, the factual basis for this objection is simply wrong. [ECF No. 161.] The objection has no basis in fact or law and could be sanctioned.[7]

Even if this were not the case, Ms. Meade's "objection[] lack[s] merit because [she] can **simply opt out** if [she] ha[s] concerns about releasing [her] claims." *Lee*, 2015 WL 5449813, at *13 (emphasis in original) (quoting *In re Managed Care Litig.,* No. 00–1334, 2003 WL 22850070, at *5 (S.D. Fla. Oct. 24, 2003); *Diaz*, 2014 WL 5488161, at *3; and citing *Faught,* 668 F.3d at 1241–42 (objection that "the settlement is unreasonable because it strips class members of their class rights while failing to resolve their individual claims" and "that the settlement does not adequately compensate them" deemed "unconvincing" since class members were "free to opt out of the class and still have the option of ... filing an individual suit"); *In re CP Ships Ltd., Secs. Litig.,* 578 F.3d 1306, 1318 (11th Cir.2009) (rejecting objection "that the district court erred in approving the settlement because foreign class members have potential for a greater recovery" in Canadian litigation since settlement class members "wishing to pursue the Canadian Actions could opt out of the instant settlement")); *see also Saccoccio*, 297 F.R.D. at 700  ("[T]o the extent that these objectors believe that they are entitled to additional relief due to unique cases, they were entitled to opt out of the settlement. They chose not to do so.") (citing *In re WorldCom Inc. Sec. Litig.,* 388 F.Supp.2d 319, 343 (S.D.N.Y.2005)).

The Court should dismiss and/or overrule Ms. Meade's objection if it is not withdrawn.

## CONCLUSION

The Court should overrule both objections in their entirety and grant final approval.

---

[7] Notably, no other class member from the Virgin Islands has objected to or opted out of the Settlement.

Respectfully submitted this 7th day of January, 2016.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Settlement Class Counsel* | Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>Florida Bar No. 617113<br>jgravante@podhurst.com<br>Matthew Weinshall<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Settlement Class Counsel* |
| Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Settlement Class Counsel* | |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 7th day of January, 2016 and served by the same means on all counsel of record.

By: _/s/ Adam M. Moskowitz_