## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-CIV-22264-BLOOM/VALLE

DWIGHT WILSON, JESUS A. AVELAR-LEMUS,
JESSIE CROSS, and MATTIE CROSS, on behalf
of themselves and all others similarly situated,

         Plaintiffs,

v.

EVERBANK, STANDARD GUARANTY
INSURANCE COMPANY, VOYAGER
INDEMNITY INSURANCE COMPANY, and
AMERICAN SECURITY INSURANCE
COMPANY,

         Defendants.

_____/

### ORDER GRANTING FINAL APPROVAL TO CLASS ACTION SETTLEMENT

**THIS CAUSE** came before the Court on January 20, 2016, for a hearing on the Plaintiffs' Motion for Final Approval, ECF No. [154], requesting that the Court grant final approval to the proposed class action settlement, overrule the objections, and grant Class Counsel's fee application (the "Final Approval Hearing"). The Court granted preliminary approval of the settlement on August 31, 2015. *See* ECF No. [151]. The hearing was held pursuant to Rule 23(e)(1)(A), Fed. R. Civ. P., requiring judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." The Court has carefully considered the Parties' written submissions, including memoranda and exhibits, the evidence and arguments presented, and the applicable law. For the reasons that follow, the Motion for Final Approval, ECF No. [154] is **GRANTED.** The proposed class action settlement and Class Counsel's fee application are **APPROVED** in their entirety, and all objections are **OVERRULED.**

## INTRODUCTION

The Settlement before the Court will make more than $12.6 million in monetary relief available to 45,504 EverBank borrowers from across the country whom Plaintiffs have alleged were charged inflated amounts for "force-placed" or lender-placed insurance ("LPI").  The monetary relief provided by the Settlement alone will likely offer each class member a better recovery than they could have won at trial, while the additional injunctive relief provided by the Settlement will enjoin for a period of five years all Defendants from engaging in the specific practices complained of.  The Settlement was a compromise reached by all Parties, in light of the substantial case law in this District, as well as from across the country, coming down on both sides of these issues.

For their efforts, Class Counsel have requested a fee in an amount equal to 19.8% of just the monetary benefits that have been made available to the Class by the Settlement, and an even lower percentage when taking into account the considerable value of the injunctive relief.  That this is an extraordinary result for the Settlement Class is reflected in the negligible opposition to the Settlement—from a class of almost 45,504 members nationwide, only two objections were filed.[1]  After carefully reviewing the submissions on that objection, including recent deposition testimony given by the objectors, the Court finds that the objection lacks merit and is based on fundamental misunderstandings of the terms of the Settlement and the law.  To the extent that the objectors were unsatisfied with the significant recovery that the Settlement offers, they were

---

[1] A class member, Michelle Meade, objected to the settlement based on her misimpression that Defendants were not "licensed to offer insurance" in the Virgin Islands, where she resides. ECF No. [160]. Ms. Meade withdrew her objection after Defendants and Class Counsel informed Ms. Meade and her attorney of their factual error.  ECF No. [166-1]. Settlement Class Member Catherine Iadevaio submitted a letter to the Court, but her letter did not object to the Settlement. ECF No. [55].

given the opportunity to opt out and pursue their own claims in separate litigation, an avenue that eight other class members elected.

The soundness of the Settlement is separately confirmed by the unanimous approval that district courts have given substantially similar settlements in LPI class actions in this District and elsewhere.  *See, e.g.*, *Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726 (S.D. Fla.); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649 (S.D. Fla.); *Hamilton v. SunTrust Mortg., Inc.*, No. 13-cv-60749 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hall v. Bank of Am., N.A.*, No. 12-cv-22700 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.); *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.); *Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y.).

### History of Lender-Placed Insurance Litigation

Before assessing the Settlement, it is important to understand some of the history of LPI litigation.  Lender-placed insurance is purchased by the mortgage servicer when the homeowner allows his or her policy to lapse. .

This Court has been at the epicenter of LPI litigation, having handled at least twenty separate LPI class actions.  In early 2011, Class Counsel here filed the first of this wave of  class actions in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.).  Although it was vigorously litigated, the parties ultimately settled and certified the *Williams* action on behalf of a Florida-only hazard LPI class, and their settlement was granted final approval on September 11, 2013.  *See id.* (ECF No. [356])

Class Counsel subsequently filed sixteen additional nationwide class actions in the Southern District of Florida against most of the major mortgage lenders and servicers and their

LPI insurers, including this litigation against the Assurant Defendants and EverBank. The litigants have now reached nationwide settlements in most of these cases. As in this case, there has been negligible opposition to these other nationwide settlements.

By the Parties' count, district courts have granted final approval to at least nine LPI class action settlements with the same structure as the Settlement here, as well as several others that are structured differently and provide much *less* monetary relief to class members. Indeed, district courts have touted LPI settlements structured like this—providing near-complete relief to class members on a claims-made basis—as extraordinary, and particularly so when compared to direct-pay LPI settlements that compensate all members of a settlement class, but provide far less relief to each class member and with payments bearing little, if any, relation to the actual alleged losses alleged by individual class members. *See Braynen v. Nationstar Mortg., LLC*, No. 14-cv-20726, 2015 WL 6872519, at *2, *14 (S.D. Fla. Nov. 9, 2015); *Lee v. Ocwen Loan Servicing LLC*, No. 14-cv-60649, 2015 WL 5449813, at *2, *18 (S.D. Fla. Sept. 14, 2015); *Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372, 2014 WL 4672458, at *13 (D. Or. Sept. 18, 2014); *see also id.* 2014 WL 5419125, at *2 (D. Or. Oct. 22, 2014).

**The Underlying Litigation**

Plaintiffs Dwight Wilson, Jesus A. Avelar-Lemus, and Jesse and Mattie Cross filed suit against EverBank, Everhome Mortgage, Assurant, SGIC, and ASIC in June 2014, bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and violations of the federal Truth in Lending Act ("TILA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), against EverBank, a tortious interference claim against the Assurant Defendants, and claims for unjust enrichment and violations of the federal RICO statute against all Defendants. ECF No. [ 1]. Plaintiffs allege that,

when a borrower was required to have insurance for his or her property pursuant to a residential mortgage or home equity loan or line of credit serviced by EverBank, and evidence of acceptable coverage was not provided, EverBank would place LPI in a manner such that EverBank allegedly received an unauthorized benefit. Plaintiffs allege further that EverBank did so primarily to receive alleged "kickbacks" in the form of commissions, or other alleged income or benefits from the Assurant Defendants. Plaintiffs also allege that the way in which LPI policies were obtained and placed caused the rates and the amount of coverage to be excessive.

Defendants moved to dismiss the original complaint in August 2014. ECF Nos. [32, 34, 36, 37]. The Court heard argument on the motions on December 5, 2015 and granted and denied them in part, with leave to amend, on January 6, 2015. ECF Nos. [ 80, 82].

Plaintiffs filed their First Amended Complaint on January 26, 2015, adding claims for violation of the New York's and Illinois' consumer fraud statutes, and amending their claim for violations of RICO. ECF No. [91]. After briefing closed on the motions to dismiss the First Amended Complaint, on March 30, 2015, and in response to EverBank's motion to dismiss for lack of subject-matter jurisdiction, this Court entered an Order to Show Cause requiring Plaintiffs to submit a memorandum addressing whether they "concede that EverBank received no commissions in connection with their individual lender-placed insurance policies or transactions." ECF No. [117]. Plaintiffs responded on April 14, 2015 and included an expert report, which addressed, among other things, Defendants' LPI program and the commissions issue raised by EverBank and the Court. ECF No. [122].

 On April 9, 2015 and April 28, 2015, the Court granted in part and denied in part Defendants' motions to dismiss the First Amended Complaint. ECF Nos. [118, 136]. The Assurant Defendants then answered the First Amended Complaint on April 22, 2015. ECF No.

[130]. EverBank answered on May 20, 2015.  ECF No. [141].  In their Answers, Defendants denied any liability or wrongdoing and asserted various affirmative defenses. ECF Nos. [130, 141].

During this time, the Parties conducted extensive discovery with Defendants producing tens of thousands of pages of documents.  ECF No. [154-2 ¶ 13].  This was in addition to the more than two million pages of documents previously produced in other LPI litigation involving the Assurant Defendants.  (*Id.*)  Plaintiffs deposed Defendants' representatives; Defendants deposed Plaintiffs Dwight Wilson, Jesus A. Avelar-Lemus, Jessie Cross, and Mattie Cross, and subpoenaed documents from nonparties. (*Id.*)

On June 11, 2015, the Parties moved to stay all proceedings pending their mediation of all issues, and the Court soon granted the motion. ECF Nos. [142, 143].  The parties agreed to mediate toward a global, nationwide settlement.  Plaintiffs filed a Second Amended Complaint addressing hazard, flood, flood-gap, and wind LPI, suing all Assurant affiliates that had cooperated with EverBank during the class period.  ECF No. [146-1]. Class Counsel conducted numerous telephone discussions with Defendants' counsel regarding the details of a possible settlement.  These discussions were based, in part, on the prior eight nationwide LPI settlements that had already been reached in this District, as well as the specific information regarding EverBank that was produced in this matter.  ECF No. [154-2 ¶¶ 14-15].

### The Settlement

On June 2, 2015, the Parties' counsel participated in a formal mediation of this matter with nationally recognized mediator Rodney Max.  ECF No. [154-2 ¶¶ 15, 81].  Mr. Max has served as the mediator in most of the other LPI class settlements.  At the mediation, the Parties reached a settlement-in-principle and soon executed a term sheet that identified the material

terms for the Stipulation and Settlement Agreement ("Settlement Agreement").  (*Id.* ¶ 18.)  The Parties announced their settlement on June 11, 2015. ECF No. [142], and finalized the Settlement Agreement's terms on July 16, 2015.  ECF No. [154-1].

As negotiated, the settlement would compensate EverBank borrowers for 12.5% of the amount that EverBank had charged them for LPI coverage, regardless of whether they had paid or were simply charged the invoiced amounts.  There is no dispute that Defendants were allowed to charge each homeowner for insurance, and Plaintiffs allege that the 12.5% recovery would essentially cover the alleged inflated portion of borrowers' charges.  The settlement would also enjoin EverBank and the Assurant Defendants from engaging in these same practices complained of for a period of five years after final approval.

On August 31, 2015, this Court granted preliminary approval to the proposed class action settlement.  ECF No. [151].  The Court also provisionally certified the Settlement Class for settlement purposes and approved the procedure for giving Class Notice to the members of the Settlement Class.   The Court finds that the Class Notice was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate.

On January 20, 2016, the Court held a duly noticed final approval hearing to consider: (1) whether the terms and conditions of the Settlement Agreement are fair, reasonable and adequate; (2) to review all objections to the Settlement's terms and Class Counsel's fee application; (3) whether a judgment should be entered dismissing the Named Plaintiffs' Second Amended Class Action Complaint on the merits and with prejudice in favor of the Defendants and against all persons or entities who are Settlement Class Members herein who have not requested exclusion from the Settlement Class; and (4) whether and in what amount to award Attorneys' Fees and Expenses to Class Counsel for the Settlement Class and whether and in what

amount to award a Case Contribution Award to the Named Plaintiffs. The Court makes the following determinations and it is **ORDERED and ADJUDGED** that:

1.      The Court has personal jurisdiction over the Parties and the Settlement Class Members, venue is proper, and the Court has subject-matter jurisdiction to approve the Settlement Agreement, including all exhibits thereto, and to enter this Final Order.

2.      The Settlement Agreement was negotiated at arm's length by experienced counsel who were fully informed of the facts and circumstances of this litigation (the "*Wilson Litigation*") and of the strengths and weaknesses of their respective positions.  There is no evidence of collusion.  Further, settlement occurred only after the Parties negotiated over a period of many weeks, and participated in a formal mediation overseen by a nationally renowned mediator, Rodney Max.  Counsel for the Parties exchanged information before, during, and after the mediation, to support Defendants' assertion that they cannot query their databases system-wide to identify how much borrowers have paid for LPI and, for those who were charged but have not paid for their LPI charges, how much they currently owe.  Counsel for the Parties were therefore well-positioned to evaluate the Settlement Agreement's benefits, taking into account the expense, risk, and uncertainty of protracted litigation with respect to numerous difficult questions of fact and law.

3.      The Court finds that the prerequisites for a class action under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b) have been satisfied for settlement purposes for each Settlement Class Member in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Named Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Named Plaintiffs have and will continue to fairly and

adequately represent the interests of the Settlement Class for purposes of entering into the Settlement Agreement; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; (f) the Settlement Class is ascertainable; and (g) a class action settlement is superior to the other available methods for the fair and efficient adjudication of the controversy.

4.      Pursuant to Fed. R. Civ. P. 23, this Court finally certifies the Settlement Class, as identified in the Settlement Agreement, which shall consist of the following:

> All borrowers in the United States who, within the Settlement Class Period, were charged by EverBank under a hazard, flood, flood gap or wind-only LPI Policy for Residential property, and who, within the Settlement Class Period, either (i) paid to EverBank the Net Premium for that LPI Policy or (ii) did not pay to and still owe EverBank the Net Premium for that LPI Policy.  Excluded from the Settlement Class are:  (i) individuals who are or were during the Settlement Class Period officers or directors of the Defendants in the Action or any of their respective Affiliates; (ii) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (iii) borrowers who only had an LPI Policy that was canceled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or to the borrower's escrow account; and, (iv) all borrowers who file a timely and proper request to be excluded from the Settlement Class.

5.      The Settlement Class Period shall commence on January 1, 2009 and shall continue through and including August 31, 2015

6.      The Court appoints the law firms of Kozyak Tropin & Throckmorton LLP, Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP as Class Counsel for the Settlement Class.

7.     The Court designates Named Plaintiffs Dwight Wilson, Jesus A. Avelar-Lemus, and Jessie and Mattie Cross as the Class Representatives.

8.     The Court makes the following findings on notice to the Settlement Class:

(a)     The Court finds that the distribution of the Mail Notice, the creation of the IVR toll-free telephone number system, and creation of the Internet site, all as provided for in the Settlement Agreement and Preliminary Approval Order, (i) constituted the best practicable notice under the circumstances to Settlement Class Members, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, their right to object or to exclude themselves from the proposed Settlement, and their right to appear at the Final Approval Hearing, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) complied fully with the requirements of Fed. R. Civ. P. 23, the United States Constitution, the Rules of this Court, and applicable law.  The Parties have complied with their notice obligations under the Class Action Fairness Act, 28 U.S.C. § 1715, in connection with the proposed settlement.

(b)     The Court finds that the Class Notice and methodology set forth in the Settlement Agreement, the Preliminary Approval Order, and this Final Order (i) constitute the most effective and practicable notice of the Final Order, the relief available to Settlement Class Members pursuant to the Final Order, and applicable time periods; (ii) constitute due, adequate, and sufficient notice for all other purposes to all Settlement Class Members; and (iii) comply fully with the requirements of Fed. R. Civ. P. 23, the United States Constitution, the Rules of this Court, and any other applicable law.

## The Settlement Is Fair, Reasonable, and Adequate

9.      Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted).  For these reasons, "there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).

10.      "Before approving a settlement, the district court must find that it 'is fair, adequate and reasonable and is not the product of collusion between the parties.'" *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 434 (11th Cir. 2012) (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).  The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.*

11.      Courts in the Eleventh Circuit evaluate six factors in determining whether to approve a class action settlement:  (1) the existence of fraud or collusion among the parties in reaching the settlement; (2) the complexity, expense, and duration of the litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, the class representatives, and the substance and amount of opposition to the settlement.  *Leverso v. S. Trust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986 (not listing absence of fraud or collusion as factor,

but still requiring its evaluation, and including "the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable").

12.     "In considering the settlement, the district court may rely upon the judgment of experienced counsel for the parties." *Nelson*, 484 Fed. App'x at 434 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  "Absent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Id.* (quoting *Cotton*).

13.     Taken together, review of these considerations compels the conclusion that the Settlement warrants final approval.

(a)     **There is no evidence of fraud or collusion among the Parties.**  "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (citing *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002)).  "There is a presumption of good faith in the negotiation process." *Id.*

This settlement was negotiated at arms' length.  The mediation was overseen by Rodney Max, a nationally renowned mediator, who submitted a sworn declaration to the Court providing details of the parties' mediation efforts. ECF No. [156-1].  Mr. Max testified that the Settlement is the product of "lengthy and particularly hard-fought negotiations[,]" which took place over the course of two months, and that the "settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." (*Id.* ¶¶ 12, 16.)  He also observed that "the caliber of representation on both sides was extraordinary in [his] experience[,]" and he did not sense collusion among the Parties at any point during the mediation process.  (*Id.*)  The very fact of Mr. Max's involvement—let alone his sworn declaration—weighs in favor of approval. *See, e.g., Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015) ("self-dealing contention"

was "belied" by involvement of experienced mediator); *Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of special master to oversee mediation evidenced procedural fairness of negotiating process).  There is no suggestion of fraud or collusion here, explicit or subtle.

  (b) **The *Wilson* Litigation involved complex claims that were litigated over the course of one year.**  The Settlement covers legal claims and defenses brought on behalf of 45,504 class members, including complex common law contractual, quasi-contractual, and tort claims, as well as claims for violations of TILA and FDUTPA. The facts of these cases are complex as well, involving allegations that the defendants inflated the amounts charged to EverBank borrowers for LPI with kickbacks disguised as commissions and below-cost servicing subsidies, among other things.  Courts nationwide that have considered these same LPI claims have reached different conclusions about whether plaintiffs can state claims for relief based on the facts alleged, whether dispositive defenses such as the filed-rate doctrine apply, and whether classes can be certified on the facts and legal theories presented.  *See Braynen*, 2015 WL 6872519, at *8-9 (discussing challenges facing plaintiffs had they continued to pursue their claims); *Saccoccio*, 297 F.R.D. at 693-94 (comparing *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) with *Cannon v. Wells Fargo Bank, N.A.*, 2014 WL 324556 (N.D. Cal. Jan. 29, 2014)).  Even more recently, in *Rothstein v. Balboa Insurance Co.*, 794 F.3d 256 (2d Cir. 2015), the Second Circuit Court of Appeals held that the filed-rate doctrine barred all of the plaintiffs' claims against an LPI carrier.  District courts have followed the Second Circuit's lead in doing the same.  *See Trevathan*, 2015 WL 6913144, at *3 & n.3; *Haddock v. Countrywide Bank, N.A.*, 2015 WL 9257316, at *19 (C.D. Cal. Oct. 27, 2015).

CASE NO. 14-CIV-22264-BLOOM/VALLE

Litigating these claims to resolution would have proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed in litigation, that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides. "Complex litigation – like the instant case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *see also In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second ... factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

This Settlement offers the Settlement Class extraordinary relief that "very likely exceeds what [they] could have won at trial." *Hall v. Bank of Am., N.A.*, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014) (quoting *Saccoccio*, 297 F.R.D. at 693)). There was nothing to be gained from engaging in litigation of the complex claims presented for years more. This factor also weighs in favor of approving the Settlement.

(c)  **The parties finalized a settlement after one year of litigation and the completion of critical discovery.** The stage of proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery

should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992); *see, e.g.*, *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *21 (D.N.J. Sept. 13, 2005) ("Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements, especially in complex class action cases, should be done.") (citation omitted); *Lipuma*, 406 F. Supp. 2d at 1324 ("courts favor early settlement"). "Indeed, vast formal discovery need not be taken." *Saccoccio*, 297 F.R.D. at 694 (citation omitted).

The Parties agreed to the Settlement's terms after one year of litigation—Plaintiffs filed their original complaint in June 2014, and the Parties announced their settlement in June 2015. The Parties briefed and argued two rounds of motions to dismiss, and significant discovery was completed on Plaintiffs' claims. Additionally, Class Counsel have been investigating and litigating claims against the Assurant Defendants for nearly four years, reviewing millions of pages of documents and taking dozens of depositions, and have become thoroughly familiar with the LPI program and practices that the Assurant Defendants use with most of the major mortgage lenders. Class Counsel also took confirming discovery post-mediation.

(d)  **Plaintiffs faced significant risks had they proceeded with litigation.** Plaintiffs might have recovered nothing for themselves or the class had they proceeded with litigation. Plaintiffs would have faced motions for class certification and for summary judgment, and possibly a lengthy trial and an appeal. Claims based on similar facts and the same or legal theories as those advanced here have met with mixed results in courts across the country, on both dispositive motions and class certification. *Compare Feaz*, 745 F.3d at 1104-11 (affirming dismissal of force-placed flood insurance "kickback" claims); *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) (affirming dismissal of force-placed hazard insurance "kickback"

claims); *with Hamilton v. SunTrust Mortg., Inc.*, 6 F. Supp. 3d 1300 (S.D. Fla. 2014) (rejecting application of *Cohen* and *Feaz* and denying motion to dismiss); *Simpkins v. Wells Fargo Bank, N.A.*, No. 12-cv-768, 2013 WL 4510166 (S.D. Ill. Aug. 26, 2013) (denying all defendants' motions to dismiss). *Compare Kunzelmann*, 2013 WL 139913, at *4-13 (denying certification of nationwide class); *with Ellsworth v. U.S. Bank, N.A.*, 30 F. Supp. 3d 886 (N.D. Cal. 2014) (certifying multistate classes). Indeed, the Court previously dismissed multiple claims at the pleadings stage, including the RICO and state consumer protection act claims. ECF Nos. [82, 118]. Defendants have also raised potentially case-dispositive defenses, including the application of the filed-rate doctrine, which the Second Circuit Court of Appeals recently applied in an LPI insurer's favor. *See Rothstein*, 794 F.3d at 261-63; *Trevathan*, 2015 WL 6913144, at *3 & n.3; *see also Braynen*, 2015 WL 6872519, at *8 & n.7 (collecting decisions dismissing LPI claims based on the filed rate doctrine).

"Significantly, none of the objectors [has] disputed that these obstacles exist and are formidable." *Hall*, 2014 WL 7184039, at *4. This factor thus weighs strongly on favor of final approval, particularly given the significant relief made available to the Settlement Class. *See, e.g.*, *id.* (finding fourth factor satisfied "[i]n light of the recovery to the class, as well as the significant litigation risk Plaintiffs faced absent settlement").

(e)     **The Settlement offers class members near-complete monetary relief as well as valuable injunctive relief.** "The range of potential recovery 'spans from a finding of non-liability through varying levels of injunctive relief,' in addition to any monetary benefits to class members." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007) (citing *Lipuma*, 406 F. Supp. 2d at 1322). "In considering the question of possible recovery, the focus is on the possible recovery at trial." *Saccoccio*, 297 F.R.D. at 693 (citation omitted).

16

CASE NO. 14-CIV-22264-BLOOM/VALLE

"[T]he Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id.* (citation omitted).

The monetary relief made available to the Settlement Class will provide class members who submit claims substantial recovery. Class members who opt to file a claim will recover 12.5% of the amounts that they paid or were charged and still owe for LPI, regardless of their individual circumstances. This 12.5% recovery is near-complete relief, and multiple courts in this District have found the same (or lesser) percentage paid in a similar LPI settlements "very likely exceeds what Plaintiffs could have won at trial." *Saccoccio*, 297 F.R.D. at 693; *see also, e.g.*, *Braynen*, 2015 WL 6872519, at *7 ("This Settlement is generous to Class Members, providing relief approximating a trial win and, for many Class Members, exceeding a trial win."). To put the result into perspective, the 12.5% made available to class members by the settlement is roughly the amount of the alleged commission or alleged "kickback." District courts have approved similar LPI settlements offering class members this same percentage or less. *See, e.g., Braynen*, 2015 WL 6872519 (approving return of 12.5% of amounts charged borrowers); *Lee*, 2015 WL 5449813 (same); *Saccoccio*, 297 F.R.D. at 689 (same); *Hall*, 2014 WL 7184039 (approving tiered settlement offering 11%, 6.5% or 5% of amounts charged, depending on when coverage was forced); *Hamilton*, 2014 WL 5419507 (approving 10.5% recovery).

Moreover, Defendants have provided evidence that regulators have recently approved as reasonable a new LPI product that would reduce the rates used to calculate the premiums charged to lenders (and then passed on to borrowers) by up to 12.5% if the lender agrees to forego the commissions that are the subject of this lawsuit. Thus, this Settlement will provide

100% of the full savings from this new, approved product.  State regulators' approval of this product further supports a finding of reasonableness here.

The settlement's claims-made structure also satisfies the applicable standard.  The Court is not charged with choosing the payment structure that it believes will provide the best possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the claims-made settlement presented is fair, reasonable, and adequate on its own terms, given the inherent risks and expense of further litigation.  *See, e.g.*, *Casey*, 2014 WL 4120599, at *2 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

Thus, although direct-pay settlements have been approved as reasonable by district courts in smaller LPI class actions, claims-made settlements can *also* be fair, reasonable, and adequate in LPI litigation, and have been found to be so in every instance on final approval.  *See, e.g., Braynen*, 2015 WL 6872519, at *13-16; *Lee*, 2015 WL 5449813, at *14-23; *Hall*, 2014 WL 7184039, at *6 ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (quoting *Saccoccio*); *Saccoccio*, 297 F.R.D. at 696 (same); *Hamilton*, 2014 WL 5419507, at *6 ("Filing a claim form is a "reasonable administrative requirement" which generally does not impose an undue burden on members of a settlement class.") (citation omitted).  *See also, e.g.*, Consent Order, *In the Matter of Am. Sec. Ins. Co., et al.* (N.Y.D.F.S. 2012)(providing claims-made structure for New York homeowners with LPI).  And the Eleventh Circuit has affirmed claims-made settlements affording far less relief to class members than that afforded here.  *See, e.g., Poertner*, 618 Fed. App'x 624 (affirming approval of claims-made settlement offering class members between six and twelve dollars for filing a claim,

as well as injunctive relief); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 Fed. App'x at 432, 434-35 (upholding claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value). Here, with 45,504 EverBank borrowers entitled to monetary relief under the Settlement, direct payment is both a less feasible model that a claims-made model and also a harder sell—a claims process may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010).  This is particularly important where a case presents a class of this size, and determining amounts to be paid directly would potentially make settlement more costly than litigation.  *See Saccoccio*, 297 F.R.D. at 696 (citing evidence that manual review of all borrowers files for a class of 800,000 "would take a thousand people … every month"). Pursuant to the Settlement's terms, Settlement Class members who submit a very simple claim form will recover 12.5% of the amounts they were charged for LPI—this is near-complete relief that very likely exceeds what they could have recovered at trial, which is extraordinary for any settlement.  No class member is required to submit ***any additional*** evidence, documents and/or support, besides simply checking a box as to whether they believe they paid and/or were simply charged for LPI.  The claim form should take no more than a few minutes for the average claimant to complete.

This is in stark contrast to what would be required if any class member decided to proceed to trial and bring any of these asserted claims against the Defendants.  The court in

CASE NO. 14-CIV-22264-BLOOM/VALLE

*Arnett* recognized this in denying class counsel's request for attorney's fees in excess of the Ninth Circuit's 25% benchmark because "the results obtained [in *Arnett*] were not extraordinary, particularly when compared to the settlements achieved in *Fladell* … and *Casey*[,]" *Arnett*, 2014 WL 5419125, at \*2, where the parties negotiated claims-made settlements that would provide participating class members with relief comparable to that offered here.  *See Arnett*, 2014 WL 4672458, at \*13 (explaining that settlements in *Fladell* and *Casey* were extraordinary because they that paid participants "longer injunctive relief and better monetary relief" of between 7% and 12.5% percent of their actual premiums with no pro rata reduction).

This is so because "[a] settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims …  What matters is the settlement's value to each class member—it is ultimately up to class members whether to participate or not." *Hall*, 2014 WL 7184039, at \*7 (internal citation omitted).

The Court must also consider the risks of continued litigation or the problems that might be presented by using a direct-pay structure for a 45,504-member class.  Plaintiffs and the class here would have faced significant hurdles had the litigation proceeded, including dispositive defenses such as the potential application of the filed-rate doctrine; the "headwinds created by" the Eleventh Circuit in *Feaz* and the Seventh Circuit in *Cohen*, *see Saccoccio*, 297 F.R.D. at 693; *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2014 WL 4248208, at \*1 (S.D. Fla. Aug. 27, 2014); class certification, which is not always granted in these cases, *see, e.g.*, *Kunzelmann*, 2013 WL 139913, at \*4-13; *Gordon v. Chase Home Finance, LLC*, No. 11-2001, 2013 WL 436445, at \*6-12 (M.D. Fla. Feb. 5, 2013); *Rapp v. Green Tree Servicing LLC*, 302 F.R.D. 505, 509-20 (D. Minn. 2014); *Gustafson v. BAC Home Loans Servicing*, 294 F.R.D. 529, 542-50 (C.D. Cal.

2013); and the very real risk that class members would recover nothing at all after several more years of litigation and appeal.

As such, the Court views the Settlement as an exceedingly fair compromise. *See, e.g.*, *Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confer[red] … to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (noting "very real potential that the [c]lass could come away from a long expensive trial with nothing," and rejecting notion "that the Class should get more"). And direct-pay settlements pose problems of their own:

> Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. Non-class members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important in a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially be more costly than litigation.

*See Hamilton*, 2014 WL 5419507, at *6; *see also, e.g.*, *Hall*, 2014 WL 7184039, at *6 ("And the Settlement Agreement's claims process is needed for other reasons, including to ensure that only aggrieved individuals receive monetary relief and to reduce the risk of fraud, waste, and abuse that might arise from sending unsolicited checks to unverified addresses and recipients.").

Finally, courts rightly consider the value of injunctive *and* monetary relief together in assessing whether a class action settlement provides sufficient relief to the class. *See, e.g.*, *Poertner*, 618 Fed. App'x at 630 (noting that objector's valuation of settlement based on monetary benefits alone was "flawed," and affirming approval based on inclusion of injunctive and *cy pres* relief); *Hamilton*, 2014 WL 5419507, at *4 ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class

members nationwide."); *Perez*, 501 F. Supp. 2d at 1381 (describing important injunctive relief in discussing range of possible recovery); *LiPuma*, 406 F. Supp. 2d at 1323 (valuing injunctive relief as part of "significant relief" made available to class and determining that settlement was fair, adequate, and reasonable). Approval of the Settlement will put an end to the practices complained of by the Plaintiffs for at least five years, protecting current and future EverBank borrowers with force-placed insurance from paying allegedly inflated charges for coverage.

In this Court's judgment, a claims-made structure offers Settlement Class members the best relief possible from this Settlement. Equally important, Defendants state that they did not, and would not, have agreed to a direct-pay model for a class of this size because the costs of administration and the risk of fraud would have been prohibitive. Even had Defendants agreed, the additional costs and increased risk would have reduced the amounts paid to individual class members. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593-94 (N.D. Ill. 2011) (approving claims-made settlement with costs associated with investigating how much was owed each Class Member; "[h]ad the onus of that process been placed on Defendant, there may have been less money available for them to pay claims."); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 198 (D.D.C. 2011) ("the case might not have settled if a condition of the agreement required PNC to mine [its] computer systems for such data"). The proposed claims-made structure will provide class members who opt to submit claims with extraordinary relief and, as such, is fair, reasonable, and adequate.

As such, this case is certainly distinct from oft-cited recent opinions from the Seventh Circuit because, unlike the settlement here, those settlements were rife with indicia of collusion between the parties and other questionable conduct. In *Eubank v. Pella*, for example, Judge Posner rejected a claims-made settlement so problematic that he termed "inequitable—even

scandalous." 753 F.3d 718, 721 (7th Cir. 2014).  The settlement reflected "almost every danger sign in a class action settlement," including "fatal conflicts of interest"; opposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve- to thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the "product identity stamp," "Unit ID Label," and purchase order number of the product at issue; and an unnecessarily complex settlement notice. *See id.* at 725-26.  Because the settlement "flunked the 'fairness' standard by the one-sidedness of its terms and … fatal conflicts of interest[,]" *see id.* at 729, it could not survive the closer scrutiny that might be warranted where "kicker" and "clear-sailing" provisions are part of a class action settlement.

The Seventh Circuit similarly rejected the settlement in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), because the district court had valued the settlement to include the costs of notice to the class and attorney's fees, 772 F.3d at 781, and of the $5.63 million to be made available to the class, approximately $4.77 million was reserved solely for counsel fees and expenses, notice costs, and *cy pres* and service awards, with only $865,284 left for the settlement class, which amounted to only seven cents per class member.  *See id.* at 780, 783-84.  The court also criticized the claim form and filing requirements as too onerous when weighed against the "low ceiling on the amount of money that a member of the class could claim[,]" *id.* at 783; the *cy pres* award as excessive when weighed against the minimal relief made available to class members, *id.* at 784; the potential ineffectiveness of the proposed injunctive relief, *id.* at 785; and the court's sense that the parties had colluded to "sell out the class by agreeing … to recommend

that the judges approve a settlement involving a meager recovery for the class but generous compensation for the lawyers[,]" *see id.* at 787 (citing *Eubank*, 753 F.3d at 720).

The relief provided by this Settlement stands in stark contrast to the relief provided in *Eubank* and *Pearson* and in almost every other respect. For example, the *Wilson* Settlement: (1) offers every class member 12.5% of the amounts that they paid or still owe, which constitutes near-complete recovery, worth hundreds of dollars to the average claimant; (2) employs a simple and straightforward claim form, which requires class members only to check a box and affirm by their signature that the information provided is accurate, and does not require *any* supporting materials, documents or data, (3) involved no collusion or conflicts of interest; and (4) provides monetary and injunctive relief that was negotiated and will be paid separate and apart from Class Counsel's fees and costs and settlement administration expenses.

The Court finds that the Settlement is more than "fair, reasonable, and adequate"—it exceeds what one might expect given that settlements are borne of compromise. The Eleventh Circuit has affirmed claims-made settlements or settlements that provided far less relief to class members than that afforded here. *See, e.g.*, *Poertner*, 618 Fed. App'x at 630 (affirming approval of claims-made settlement offering class members up to $12 in monetary relief); *Faught*, 668 F.3d at 1238 (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 Fed. App'x at 432, 434-35 (upholding claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value); *Bennett*, 737 F.2d at 986 (5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (recovery of between 9% and 45% was "exemplary result").

As such, the fifth factor weighs strongly in favor of final approval.

(f)      **There is little opposition from members of the Settlement Class, and Class Counsel and the class representatives support the Settlement.**      From a class of 45,504 members, only Amirali and Janet Jabrani, a married couple, object to terms of the Settlement in their joint objection, and only eight more have opted to exclude themselves from the class. The Court finds that the Jabranis' objection is based on a misunderstanding or misconstruction of the Settlement's terms.

Class Counsel advocate for final approval, and their opinion is firmly based in their significant experience with LPI litigation.  Class Counsel have been investigating LPI practices for more than four years, and have litigated (or are engaged in litigating)  21 LPI class actions in this District, eight of which have already been granted final approval after settlement; five more of which settled in recent months, and five that remain in litigation.[2]  As part of this effort, Class Counsel have reviewed millions of pages of documents from Defendants alone, participated in dozens of depositions, and become thoroughly familiar with the major mortgage lenders' LPI practices, as well as the claims and legal theories advanced in these cases.  Based on this experience, and their decades of experience litigating consumer class action lawsuits, it is Class Counsel's well-informed opinion that the Settlement is fair, reasonable, adequate, and in the best interests of the Class.  The Court gives "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988).

---

[2] Of the two cases that remain, one was denied class certification, while the other was subsumed by the *Casey* settlement in the Northern District of New York.

14.    For the reasons set forth above, the Court finds that the Settlement is fair, reasonable, and adequate, and not the product of collusion.  The Parties are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

15.    The terms of the Settlement Agreement and of this Final Order, including all exhibits thereto, shall be forever binding in all pending and future lawsuits maintained by the Named Plaintiffs and all other Settlement Class Members, as well as their family members, heirs, guardians, assigns, executors, administrators, predecessors, successors, and assigns.

### *Class Counsel's Fee Award Is Well within the Range Set Forth by the Eleventh Circuit*

16.    Class Counsel has filed an application for attorney's fees and expenses in the amount of $2.5 million.   As discussed more fully below, Class Counsel's application is **GRANTED.**

17.    Both the United States Supreme Court and the Eleventh Circuit have expressly approved calculating fees by applying the percentage-of-recovery method to the total value of the settlement.  *See Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999) (affirming fee award of 33-1/3% of total amount made available to class, and determining that attorney's fees may be determined based on total fund, not just actual payout to class); *see also Poertner*, 618 F. App'x at 628 (quoting *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("attorney's fees awarded from a common fund shall be based on a reasonable percentage of the fund established for the benefit of the class")); *David v. Am. Suzuki Motor Corp.*, No. 08-cv-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which

a percentage fee may be awarded, even if the fee is separately paid by the defendant). Fees are awarded, that is, based on a percentage of the total benefits made available, regardless of the actual payout to the class following a claims process. *See Waters*, 190 F. 3d at 1295-96.

18.     The Eleventh Circuit recently reaffirmed its support for this approach in *Poertner v. Gillette Co.*, *supra*, stressing that class counsel's fee award should also be based on consideration of "any non-monetary benefits conferred upon the class by the settlement," such as injunctive relief, as well as "the economics involved in prosecuting a class action." 618 Fed. App'x at 629 (citation omitted).

19.     Moreover, in the Eleventh Circuit, "the lodestar approach should not be imposed through the back door via a 'cross-check.'" *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases")). In *Camden I*, the court criticized the inefficiencies of lodestar approach, 946 F.2d at 773-75, and other courts have called it into question because it "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1363 (citing *David*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010)).

20.     The result here is extraordinary, and perhaps best supports the justice of Class Counsel's requested fee award. To be sure, the result achieved by counsel is a major factor to consider in making a fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 436, (1983) ("critical factor is the degree of success obtained"); *Pinto*, 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at

CASE NO. 14-CIV-22264-BLOOM/VALLE

547-48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). In considering the results, courts examine the value of *both* monetary and injunctive relief.  *See Poertner*, 618 F. App'x at 628-29; *Perez*, 501 F. Supp. 2d 1360; *LiPuma*, 406 F. Supp. 2d at 1323; *In re Managed Care Litig.*, 2003 WL 228500700, at *6 (S.D. Fla. Oct. 24, 2003). The results here are excellent—Settlement Class members will recover near-complete relief and Defendants will be mandated to cease the key practices which are the gravamen of Plaintiffs' complaint.  These results are powerful support the fee award.

21.     The $2.5 million sought by Class Counsel for fees and expenses constitutes 19.8% of the value of just the monetary relief made available to the Settlement Class, which is well within the range approved by the Eleventh Circuit.  *See, e.g., Camden I*, 946 F.2d at 774 (20%-50% of value provided); *David*, 2010 U.S. Dist. LEXIS 146073, at *26 n.15 (20% to 50% of common fund is "the customary fee in class actions that result in substantial benefits").  It is also well in keeping with fee awards approved by other courts in lender-placed insurance litigation.  *See, e.g., Hamilton*, 2014 WL 5419507, at *7-8 (approving award of 16% of the total monetary benefits made available to the settlement class); *Saccoccio*, 297 F.R.D. at 694 (approving 6.7% award); *Hall*, 2014 WL 7184039, at *9 (approving 7% fee award as "well in line with the bulk of the fee awards in class action litigation").  *See also, e.g., Casey v. Citibank, N.A.*, No. 13-cv-820 (N.D.N.Y. Sept. 12, 2014)(approving award of 8% of monetary value of settlement). Class Counsel also filed the affidavit of former District Judge Thomas Scott, ECF No. [154-3], who provided the Court with an extensive sworn Expert Report detailing the reasonableness of the proposed fee for Class Counsel which the Court finds very persuasive.

22.     This amount seems all the more reasonable taking into account the potential value of the injunctive relief afforded by the Settlement—an end to the practices complained of

nationwide for at least five years—and the considerable risk that Plaintiffs' counsel undertook in pursuing these claims. The fee award in this case was contingent on a good result—Class Counsel would have recovered nothing if it had not secured recovery for the class. "For a complex and sophisticated case such as this one, class counsel took considerable financial risk in pursuing the case." *Saccoccio*, 297 F.R.D. at 695.

23.     Class Counsel and their co-counsel undertook significant risk in pursuing the *Wilson* Litigation, and invested considerable effort in seeing it through to settlement. Class Counsel would not have recovered any fee or its expenses had the Court declined to certify a class or dismissed the case on summary judgment, or had they lost at trial. And these results were real possibilities—courts in this Circuit and others have dismissed LPI class actions and denied class certification. *See, e.g.*, *Feaz*, 745 F.3d 1098 (affirming dismissal of force-placed insurance class action based on Alabama law); *Gustafson*, 294 F.R.D. 529 (denying class certification); *Kunzelmann*, 2013 WL 139913, at *4-13 (denying class certification). This Court, too, expressed skepticism that Plaintiffs claims would suffice at later stages of litigation. *See* ECF No. [82 at 11].

24.     The attorneys for the Class also spent considerable time litigating the class claims, which involved complex issues of fact and law, and negotiating and administering the Settlement, which offers extraordinary relief to Settlement Class members. Class Counsel defended against motions to dismiss, investigated the class claims, and took discovery. Just as important, Class Counsel continues to deal with thousands of class members in this case on an almost monthly basis regarding this case, as well as the millions of other class members that they deal with, who are all a part of the numerous other lender placed settlements that have already been approved by courts in this district.

25.     The Parties negotiated the settlement at arms'-length over the course of approximately two months; briefed preliminary and final approval, participated in a hearing advocating for final approval; and prepared the notices and claim forms that were mailed to the 45,504 members of the class.

26.     Further, the Settlement requires a continuing role for Settlement Class Counsel after final approval in reviewing the payments made to Class Members, as well as information on denied claims and reasons for denial. Class Counsel have negotiated a procedure to resolve any disagreements with Defendants regarding denied claims and will not involve the Court unless those procedures fail to result in a mutually agreeable solution.  Class Counsel have also responded to thousands of Class Member calls and written inquiries concerning the Settlement and will continue to do so.  Finally, Class Counsel will be responsible for responding to any appeal that may filed and for handling all other post-approval proceedings.  These efforts more than justify the requested $2.5 million fee.

27.     Accordingly, the Court finds that $2.5 million is a reasonable amount for attorneys' fees and expenses in this action.  Class Counsel's application for attorneys' fees and expenses in that amount is **GRANTED.**

### *Class Representative Service Awards*

28.     The Court also awards Case Contribution Awards in the amount of $5,000.00 each to Named Plaintiffs Dwight Wilson, Jesus A. Avelar-Lemus, and Jessie and Mattie Cross, payable pursuant to the terms of the Settlement Agreement.  Private class action suits are a primary weapon in the enforcement of laws designed for the protection of the public. *See Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007).  The Representative Plaintiffs have acted as private attorney generals seeking a remedy for what appeared to them to

be a public wrong.  *See id.*  Class Counsel has represented that the Class Representatives aided in the investigation of these claims and settlement.  Approval of this award is warranted as a matter of policy and is appropriate under applicable precedents.  Therefore, Class Counsel's application for a $5,000 service award for each Settlement Class representative is **GRANTED**.

### *Objections to the Settlement*

29.      There remains only one pending objection to the Settlement, filed by Amirali and Janet Jabrani and their counsel, Mr. Christopher Bandas.  ECF No. [158].  Neither the Jabranis or their counsel appeared at the Final Approval Hearing. Both Mr. and Mrs. Jabrani provided deposition testimony to Class Counsel and the Defendants after filing their written objection, but before the Final Approval Hearing.  The Court considered that testimony and notes that it differs from the written objection filed by counsel for the Jabranis.  The written objection challenges three related aspects of the Settlement: (1) its claims-made structure, (2) Class Counsel's proposed fee award, and (3) Class Counsel's adequacy for having pursued what the Jabranis view as a flawed compromise.  ECF No. [158]. The objection lacks merit, as explained in detail below.

***Claims-Made Structure***

30.      The Jabranis challenge the "claims-made" structure of the parties' settlement, arguing that it does not provide the best possible relief to the maximum number of class members, and suggesting, without any evidence of their own, that it is unnecessary.  The Jabranis' arguments against a claims-made structure not only derive from pure speculation about Defendants' capacities and willingness to pay near-complete relief directly to almost 45,504 borrowers, but reflect a misunderstanding the Court's task in assessing the proposed structure.

31.     The Court is not tasked with either choosing the payment structure that it believes will provide the best possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the claims-made settlement presented is fair, reasonable, and adequate given the inherent risks and expense of further litigation. *See, e.g.*, *Casey*, 2014 WL 4120599, at \*3 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties"). Thus, although direct-pay settlements have been approved as reasonable by district courts in smaller force-placed insurance class actions, claims-made settlements can also be fair, reasonable, and adequate in LPI litigation, and have been found to be so *in every instance* where they have been presented for final approval.  *See, e.g.*, *Lee*, 2015 WL 5449813, at \*15 (overruling objection to claims-made structure of settlement); *Hall*, 2014 WL 7184039, at \*6 ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.") (quoting *Saccoccio*); *Saccoccio*, 297 F.R.D. at 696 (same); *Hamilton*, 2014 WL 5419507, at \*6 ("Filing a claim form is a "reasonable administrative requirement" which generally does not impose an undue burden on members of a settlement class.") (citation omitted); *Casey*, 2014 WL 4120599, at \*2-3.

32.     Although direct-pay settlements have been agreed to, and negotiated in a few other lender-placed insurance class actions, as Class Counsel and Defendants' counsel have explained, those direct-pay settlements offered much less relief to class members than will be paid here.  In *Arnett v. Bank of America, N.A.*, *supra*, for example, the parties settled claims based on both theories, with a direct-pay structure designed to distribute settlement proceeds to class members with "commission"-based claims, and a claims-made structure for borrowers with

claims based on excess coverage.[3]  2014 WL 4672458, at *6-8.  Under the direct-pay program,

Bank of America established a common fund from which attorney's fees, service awards, and

certain administration costs were deducted first.  *See Arnett*, Settlement Agreement, ECF No.

[237-1 ¶¶ 2(u), 2(w), 27, 28].  The remaining "Net Settlement Fund" was distributed to the class

based on their pro rata settlement shares of the total net written premium. *See id.* ¶ 29.  The end

result was that class members received *2.28% of the premium paid*, with the average gross

payout equaling $69.14.  *See* 2014 WL 4672458, at *12 & n.14.

33.     Here, by contrast, Settlement Class members who submit claims will recover

12.5% of their LPI charges.  Claim settlement relief will be worth hundreds of dollars to the

average claimant.  This near-complete relief very likely exceeds what Settlement Class members

could have recovered at trial, which is extraordinary for any settlement.  The court in *Arnett*

recognized this in denying class counsel's request for attorney's fees in excess of the Ninth

Circuit's 25% benchmark because "the results obtained [in *Arnett*] were not extraordinary,

particularly when compared to the settlements achieved in *Fladell* … and *Casey*[,]" 2014 WL

5419125, at *2, where the parties negotiated claims-made settlements that would provide

participating class members with relief comparable to that offered here.  *See also Arnett*, 2014

WL 4672458, at *13 (explaining that settlements in *Fladell* and *Casey* were extraordinary

because they paid claimants "longer injunctive relief and better monetary relief" of between 7%

and 12.5% percent of their premiums without pro rata reduction).

---

[3] The excess coverage claim concerned the practice of informing the borrower that they needed
to purchase additional insurance in order to comply with their insurance obligations.  Borrowers
who purchased the additional insurance were allowed to make claims for a portion of the fund.  It
would have been possible for the defendant to search its records for evidence of this individual
insurance, however, like this action, that process would have been too time consuming and
expensive.  Accordingly, the parties agreed to a claims-made structure in *Arnett* for that portion
of the settlement.

34.     This is so because "While a claims-made structure does not guarantee an award to all class members, it does tend to maximize the opportunity available to each class member." *Braynen*, 2015 WL 6872519, at *14.   "A settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims …   What matters is the settlement's value to each class member—it is ultimately up to class members whether to participate or not."  *Hall*, 2014 WL 7184039, at *7 (internal citation omitted).  This makes sense because "[n]egotiating for a smaller settlement amount to go to Class Members would, in effect, unfairly reward some Class Members for their indifference at the expense of those who would take the minimal step of returning the simple Claim Form to receive the larger amount." *Braynen*, 2015 WL 6872519, at *14.

35.     The objection fails to  consider the risks of continued litigation or the problems that might be presented by using a direct-pay structure for a 45,504-member class.  Plaintiffs and the Settlement Class here faced significant hurdles had the litigation proceeded, including dispositive defenses such as the potential application of the filed-rate doctrine; the "headwinds created by" recent appellate decisions; class certification, which is not always granted in these cases; and the very real risk that class members would recover nothing at all after several more years of litigation and appeal.  As such, the Court views the Settlement as a fair compromise. *See, e.g.*, *Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confer[red] … to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

36.     Direct-pay settlements pose problems of their own:

Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation.  Non-class members could endorse over to themselves

34

CASE NO. 14-CIV-22264-BLOOM/VALLE

> misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important in a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially be more costly than litigation.

See *Hamilton*, 2014 WL 5419507, at *6; *see also Braynen*, 2015 WL 6872519, at *15 (same); *Hall*, 2014 WL 7184039, at *6 ("And the Settlement Agreement's claims process is needed for other reasons, including to ensure that only aggrieved individuals receive monetary relief and to reduce the risk of fraud, waste, and abuse that might arise from sending unsolicited checks to unverified addresses and recipients.").

37. The Jabranis' arguments against a claims-made structure also fail to account for any of the injunctive relief secured for the class. Courts rightly consider the value of injunctive *and* monetary relief in assessing whether a class action settlement provides sufficient relief to the class. *See, e.g.*, *Poertner*, 618 Fed. App'x at 629, 630; *Perez*, 501 F. Supp. 2d at 1381 (describing important injunctive relief in discussing range of possible recovery); *LiPuma*, 406 F. Supp. 2d at 1323 (valuing injunctive relief as part of "significant relief" made available to class and determining that settlement was fair, adequate, and reasonable); *Hamilton*, 2014 WL 5419507, at *4 ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class members nationwide."). Approval of the Settlement will put an end to the practices complained of for at least five years.

38. In this Court's judgment, a claims-made settlement here offers Settlement Class members best relief possible from this Settlement. Defendants likely would not have agreed to a direct-pay model for a class of this size, because the costs of administration and the risk of fraud would have been prohibitive. Even had Defendants agreed, the additional costs and increased risk would have reduced the amounts paid to individual class members. The proposed claims-

made structure will provide class members who opt to submit claims with extraordinary relief and, as such, is fair, reasonable and adequate.

***Class Counsel's Fees***

39. The Jabranis also object to counsel's proposed fee award on the ground that it should have been calculated as a percentage of the value of the claims actually paid to class members rather than as a percentage of the total relief made available to the Settlement Class. ECF No. [158]. But the Eleventh Circuit was clear in *Poertner*: calculating class counsel's fees as a percentage of the value of the claims actually paid to class members is *not* the appropriate method for awarding fees and expenses in the Eleventh Circuit. *See Poertner*, 618 Fed. App'x at 630. The court held:

> [The Objector] claims that the settlement is unfair because class counsel's slice of the settlement pie is too large (i.e., the fees-and-costs award is unreasonable). But this objection is based on [his] *flawed valuation of the settlement pie*: limiting the monetary value to the amount of Gillette's actual payments to the class along with excluding the substantial nonmonetary benefit and the cy pres award.

*Id.* (emphasis added).

40. Class Counsel's fees were calculated in keeping with the Eleventh Circuit's approved methodology. *See, e.g., id.* at 626-27, 630 (class counsel's fee award reasonable under percentage-of-fund method); *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991) ("attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class"); *Saccoccio,* 297 F.R.D. at 695 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class.") (citing *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295–96 (11th Cir.1999)); *Fladell v. Wells Fargo Bank, N.A.*, 2014 WL 5488167, at *4-5; *David v. Am. Suzuki Motor Corp.*, No. 08–CV–22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010)

CASE NO. 14-CIV-22264-BLOOM/VALLE

(settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007).

41.     Class Counsel's proposed fees-and-costs award also falls well within the range set by the Eleventh Circuit. "[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the 25 percent 'benchmark,' even in so-called 'mega-fund' cases." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added; awarding fees of 31½% of settlement fund).  The proposed $2.5 million fee amounts to just 19.8% of the total monetary relief made available to the nationwide class, and even less when the value of the settlement's injunctive relief is taken into account.

42.     Basing counsel's fees on the claims rate, as the Jabranis suggest, would be neither reasonable nor equitable.  As Judge Cohn reasoned last year in an opinion approving a claims-made settlement involving force-placed insurance:

> Where, as here, a claims-made process is a reasonable method for providing prompt and substantial relief to the class, requiring class members to file claim forms also maximizes the relief available to class members who opt to submit a claim. A settlement's fairness is judged by the *opportunity* created for the class members, *not by how many submit claims.* What matters is the settlement's value to each class member—it is ultimately up to class members to participate or not.

*Hamilton*, 2014 WL 5419507, at *7 (emphasis supplied).

43.     Correspondingly, the valuation of counsel's fees should be based on this opportunity—courts should give considerable weight to counsel's efforts to afford class members the opportunity to recover meaningful relief by availing themselves of a claims process

that is procedurally fair.  And counsel should not be penalized for class members' failure to take advantage of such a settlement:

> There may be many reasons or no reasons why class members decide to participate in a settlement, *e.g.,* a desire not to be involved in litigation, ideological disagreement with the justice system, their individual experiences with lender-placed insurance, or sympathy for the defendant. Further, class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form. Whatever the underlying reason, that is a decision to be made by each class member. Those decisions, however, do not affect whether the settlement provided to the Class is fair, adequate, and reasonable.

*Hall,* 2014 WL 7184039, at *8.

44.     Class Counsel have also undertaken significant economic risk in litigating class this class action.  The risk of litigating a nationwide class action is often exacerbated by the existence of competing parallel proceedings in other courts, which may reach settlement or certification first, and the considerable amount of labor that is usually undertaken to litigate a class action to resolution.  Taken together, these considerations render the Eleventh Circuit's approach sound and equitable.

45.     The Jabranis argue further that the proposed fee award should have been based on a lodestar-crosscheck method for calculating fees, but in the Eleventh Circuit, "the lodestar approach should not be imposed through the back door via a 'cross-check.'" *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases")).  In *Camden I*, the court criticized the inefficiencies of lodestar approach, vacating the district court's order utilizing the lodestar and risk enhancement method in calculating the attorneys' fee, and directing the district court to determine a reasonable attorneys' fee based upon a percentage of a common fund.  *See* 946 F.2d at 773-75.  Other courts have also called the lodestar-crosscheck method into question because it "creates an incentive to keep

litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Overdraft*, 830 F. Supp. 2d at 1363 (citing *David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010)).

46.     Taken together, these considerations compel the Court to overrule the objection to Class Counsel's fees-and-costs award.

***Adequacy of Class Counsel***

47.     The Jabranis finally argue in their written submission that Class Counsel is inadequate because they agreed to a claims process "that was unnecessary and designed to keep claims and the amount paid by Everbank artificially low." ECF No. [158 at 11]. This argument is not only wholly conclusory, but also disregards the law and the evidence that the parties have presented that they negotiated the settlement at arms-length. As already established, the Court is not charged with determining whether a claims-process was *necessary* or even the best-possible option; its sole task is to determine whether the settlement negotiated is fair, reasonable, and adequate and not the product of collusion. As Judge Goodman observed in *Lee*:

> [*Poertner v.*] *Gillette* also rejects the notion that the Court must identify the payment structure that would provide *optimal* relief to the class, or that a claims-made process may be employed only if the parties show that it is necessary. The Court's job instead is to determine whether the settlement presented is fair, reasonable, and adequate.

*Lee*, 2015 WL 5449813, at *16 (citations omitted). *See also, e.g., Casey*, 2014 WL 4120599 (claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay structure and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

48.     Thus, Class Counsel cannot be deemed inadequate simply for agreeing to a payment structure that was not absolutely *necessary*.  The Court should instead direct its focus to whether the claims-made structure negotiated here is fair, reasonable, and adequate.  Numerous courts presented with LPI settlements with the same structure have held that it is. *See, e.g.*, *Lee*, 2015 WL 5449813, at *13-14; *Braynen*, 2015 WL 6872519, at *11-14; *Saccoccio*, 297 F.R.D. at 696; *Fladell*, 2014 WL 5488167, at *4; *Hall*, 2014 WL 7184039, at *6-8; *Hamilton*, 2014 WL 5419507, at *4-7; *Casey*, 2014 WL 4120599, at *2-3; *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.) ECF No. [356 at 2-3].

49.     Moreover, there was no collusion among the Parties, nor is there any reason to believe that Class Counsel would put their own interests before those of class members.  To the contrary, the Assurant Defendants have offered the declaration of Rodney Max, who oversaw the mediation and "never sensed any collusiveness between the parties." Mr. Max observed that "the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." ECF No. [156-1 ¶ 16].  The Parties also negotiated fees and costs *after* they had finished negotiating the Settlement's other terms, which provides further support for a finding that there was no collusion.  *See, e.g.*, *Lee*, 2015 WL 5449813, at *12 (citing authority to holding that negotiation of fees after other terms of settlement supports finding of no collusion).

50.     Class Counsel has also been approved as adequate under Rule 23(a) in no fewer than thirteen LPI class actions before this one, by six different judges in this District.  And, "[t]he Settlement's relief—which replicates a model approved in multiple other LPI class action settlements—independently confirms the absence of collusion." *Id.*

51.     Nor is there any basis to conclude, as the Jabranis suggest, that the claims process was designed to keep the claims process low: every class member was mailed a claim form to

ensure his or her participation, claim forms and instructions were mailed in English and Spanish, notice of the settlement was published twice in *USA Today*, a settlement website provided class members with copies of important settlement documents and enabled them to upload their claim forms online, a toll-free number was established for additional information, and Class Counsel set up a call center in their own offices to handle class member questions about the Settlement and claims process and help to resolve any issues with deficient claims.   The claims-made structure of this settlement is not only fair, but also offers 45,504 class members near-complete relief and prompt recovery, which could not have been achieved with a direct-pay model.   The Jabranis' objections also omit any consideration of the relative strengths and weakness of the Class's claims.  *See, e.g.*, *Henderson v. Volvo Cars of N. Am.*, No. 09–4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) (collecting cases rejecting objections that merely complained about the lack of full relief and holding that "[o]bjections based solely on the amount of the award lack merit"); *Apple iPhone4*, 2012 WL 3283432 at *2 ("[O]bjections seeking a 'better' result are not sufficient to overturn a settlement agreement.").  As the Ninth Circuit has observed:

> Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.

*Hanlon v. Chrysler Corp.*, 150 F.3d at 1011, 1027 (9th Cir. 1998).

52.     As in *Hanlon*, the fact that the overwhelming majority of the class did not opt out presents significant positive commentary as to its fairness.  Additionally, as the court noted in *Hanlon* and the Eleventh Circuit established in *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994), the dispositive question for this Court is not whether the Settlement

fully compensates Class Members for their injuries, but whether it is fair, adequate, and free from collusion.  18 F.3d at 1530 n.6.

53.     The negotiated settlement offers class members extraordinary relief, and particularly so taking these risks into consideration.  Accordingly, the Jabranis' objection is **OVERRULED** in its entirety.

### *The Releases*

54.     "In class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, known and unknown claims, or even claims over which the court lacked jurisdiction." *Faught v. Am. Home Shield Corp.*, 2010 WL 10959223, at *15 (N.D. Ala. Apr. 27, 2010) (citations omitted); *see also Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 420 (11th Cir. 2009) ("Given a broad enough settlement agreement ... and provided that [a class member] had notice of it and an opportunity to opt out, it is perfectly acceptable for the [settling class] action to preclude his claims, even if they could not have been part of that action itself.").

55.     Too narrow a release would leave future defendants with little incentive to settle class action lawsuits on a claims-made basis.  A release of the Settlement Class's claims is a necessary precondition to Defendants' agreement to settle; without it, Defendants could be subject to individual lawsuits by individual class members for years to come, and would incur the additional costs associated with litigating those actions.  Class members who wish to retain their claims and except themselves from the settlement's terms, including the release, have been given the opportunity to do so by opting out.  This is fair, reasonable, and sufficient under the law: "There is nothing unusual or unfair about Defendant's interest in finality and repose, nor in its desire to be released from Class Members' claims, and not be threatened with the prospect of

potential double recoveries. Indeed, there would be no reason for a defendant to enter into a settlement of a class action that would leave it subject to additional class actions asserting the same or similar claims." *Faught*, 2010 WL 10959223, at *15.

56.     The Releases, which are set forth in Section 10 of the Settlement Agreement and which are also set forth below, are expressly incorporated herein in all respects and are effective as of the date of this Final Order; and the Released Persons (as that term is defined below and in the Settlement Agreement) are forever released, relinquished, and discharged by the Releasing Persons (as that term is defined below and in the Settlement Agreement) from all Released Claims (as that term is defined below and in the Settlement Agreement).

(a)     <u>Release and Waiver Definitions</u>

(i)     "EverBank" means EverBank and its predecessors and successors.

(ii)     "Affiliate" of an entity means any person or entity which controls, is controlled by, or is under common control with such entity.

(iii)     "Assurant Defendants" means ASIC, SGIC, and VIIC.

(iv)     "Defendants" mean all named defendants in the *Wilson* Litigation, including EverBank and the Assurant Defendants.

(v)     "Lender-Placed Insurance" or "LPI" means the placement of hazard, flood, flood gap, or wind-only insurance pursuant to a mortgage loan agreement, serviced by EverBank to cover a borrower's failure to maintain the required insurance coverage on the Residential property securing the loan.

(vi)     "LPI Policy" means a lender-placed Residential hazard, flood, flood gap, or wind-only insurance policy and such insurance coverage placed pursuant to a

mortgage loan agreement, serviced by EverBank to cover a borrower's failure to maintain the required insurance coverage on the Residential property securing the loan.

(vii)    "Release" or "Releases" means the releases of all Released Claims by the Releasing Persons against the Released Persons.

(viii)    "Released Claims" means all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, demands, and any other forms of liability released pursuant to this Final Order and Judgment and defined in Section 10 of the Settlement Agreement (which definition is hereby incorporated by reference).

(ix)    "Released Persons" means, only with respect to Released Claims: (a) Defendants, Assurant, Inc., and each of their respective past or present, direct or indirect, Affiliates, parent companies, subsidiaries, divisions, predecessors, successors, assigns, investors, and all past or present officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of any such entities or persons; (b) any other insurance carriers that issued or may have issued LPI for EverBank insuring real property owned by any Settlement Class Member; and (c) any trustee of a mortgage securitization trust which included loans made to any Settlement Class Member, including, but not limited to, any direct or indirect subsidiary of any of them, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

(xi)    "Releasing Persons" means Named Plaintiffs, all Settlement Class Members, and their respective family members, heirs, administrators, successors, and assigns.

(b)    <u>Released Claims</u>.  Each Releasing Person shall, by operation of the Final Order, be deemed to have fully, conclusively, irrevocably, forever, and finally released,

relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each Settlement Class Member may have until the close of the Settlement Class Period or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, that were or could have been sought or alleged in the *Wilson* Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning EverBank's placement, or the Assurant Defendants' issuance, of LPI Policies during the Settlement Class Period, including but not limited to conduct, policies or practices concerning LPI Policies or to charges for EverBank's Placement of LPI Policies during the Settlement Class Period.  In agreeing to this Release, Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

(i)       The Release stated above shall include, but not be limited to, all claims related to any LPI placement regardless of whether the LPI Policy was entirely or partially canceled; all claims related to EverBank's insurance requirements; the relationship, whether contractual or otherwise, between EverBank and the Assurant Defendants regarding LPI, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by EverBank; the payment or receipt of

commissions, income or benefits relating to reinsurance agreements, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by EverBank; any alleged "tying" arrangement involving EverBank and LPI; any alleged breach of contract, breach of an implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, or any other alleged breach of any common law duty or obligation or any alleged violation of any federal or state statute or regulation, by EverBank concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by EverBank; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by EverBank; the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by EverBank; the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by EverBank; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by EverBank.

              (ii)      The Release above shall not cover claims arising after the close of the Settlement Class Period, nor insurance claims for losses relating to properties insured under any LPI Policy placed or charged for by EverBank.  Nothing in the Settlement Agreement shall be deemed a release of any Settlement Class Member's respective rights and obligations arising under the Agreement.  Further, nothing in any provision of the Settlement Agreement shall be deemed a release of any claims by borrowers who were charged for LPI that was purchased or placed by mortgage servicers other than EverBank.

(iii)     Except to the extent that any such obligation is being released, this Final Order shall not be deemed a release of Defendants from any existing obligation to any Settlement Class Member under any loan, note, mortgage, or deed of trust.  This provision is not meant to and does not limit the Releases in this Final Order or in the Settlement Agreement.

(c)     The Named Plaintiffs and Class Counsel have represented that there are no outstanding liens or claims against the *Wilson* Litigation, it being recognized that the Named Plaintiffs will solely be charged with the responsibility to satisfy any other liens or claims asserted against the *Wilson* Litigation.

(d)     Without in any way limiting their scope, the Releases cover by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, or any other fees, costs, and/or disbursements incurred by Class Counsel, the Named Plaintiffs, or any Settlement Class Members in connection with or related in any manner to the *Wilson* Litigation, the settlement of the *Wilson* Litigation, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in the Settlement Agreement.

(e)     In connection with the foregoing Releases, the Named Plaintiffs and each Settlement Class Member expressly waive, and shall be deemed to have waived to the fullest extent permitted by law, any and all provisions, rights, benefits conferred by Section 1542 of the California Civil Code, and any statute, rule and legal doctrine similar, comparable, or equivalent to California Civil Code Section 1542, which provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

To the extent that anyone might argue that these principles of law are applicable - notwithstanding that the Parties have chosen Florida law to govern this Settlement Agreement - the Named Plaintiffs hereby agree, and each Settlement Class Member will be deemed to agree, that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished, and released.   The Named Plaintiffs recognize, and each Settlement Class Member will be deemed to recognize, that, even if they may later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of the Final Order, they fully, finally, and forever settle and release any and all claims covered by the Releases.

(f)     The Releases were bargained for and are a material element of the Settlement Agreement.

(g)     The Releases do not affect the rights of persons who would otherwise fall within the definition of the Settlement Class who timely and properly submitted a Request for Exclusion from the Settlement Class in accordance with the requirements of the Preliminary Approval Order and in Section 11 of the Settlement Agreement.

(h)     The administration and consummation of the Settlement as embodied in the Settlement Agreement shall be under the authority of the Court.

(i)     The Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members, and the Released Persons shall not be subject to liability or expense for any of the Released Claims to any Settlement Class Member(s).

(j)     The Releases shall not preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.   The

Releases set forth herein and in the Settlement Agreement are not intended to include the release of any rights or duties of the Parties arising out of the Settlement Agreement, including the express warranties and covenants contained herein.

57.     Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein, nor this Final Order, nor any of its terms and provisions, nor the Final Judgment to be entered pursuant to this Final Order, nor any of its terms and provisions, shall be:

(a)     offered by any person or received against the Defendants as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by the Defendants of the truth of the facts alleged by any person or the validity of any claim that has been or could have been asserted in the *Wilson* Litigation or in any litigation, or other judicial or administrative proceeding, or the deficiency of any defense that has been or could have been asserted in the *Wilson* Litigation or in any litigation, or of any liability, negligence, fault or wrongdoing of the Defendants;

(b)     offered by any person or received against the Defendants as evidence of a presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved or made by the Defendants or any other wrongdoing by the Defendants;

(c)     offered by any person or received against the Defendants as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing in any civil, criminal, or administrative action or proceeding;

(d)     offered or received in evidence in any action or proceeding against any Party hereto in any court, administrative agency, or other tribunal for any purpose whatsoever,

other than to enforce or otherwise effectuate the Settlement Agreement (or any agreement or order relating thereto), including the Releases, or the Final Order, or the Final Judgment to be entered pursuant to this Final Order.

58.     This Final Order, the Final Judgment to be entered pursuant to this Final Order, and the Settlement Agreement (including the exhibits thereto) may be filed in any action against or by any Released Person (as that term is defined herein and the Settlement Agreement) to support a defense of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

59.     Without further order of the Court, the Parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement.

60.     This Final Order, and the Final Judgment to be entered pursuant to this Final Order, shall be effective upon entry.  In the event that the Final Order and the Final Judgment to be entered pursuant to this Final Order are reversed or vacated pursuant to a direct appeal in this Action or the Settlement Agreement is terminated pursuant to its terms, all orders entered and releases delivered in connection herewith shall be null and void.

DONE and ORDERED in Chambers in Miami, Florida, this 3rd day of February, 2016.

_____
BETH BLOOM
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**

All counsel of record

CASE NO. 14-CIV-22264-BLOOM/VALLE